UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



TRUSTEES OF THE
UNITE HERE NATIONAL HEALTH FUND and
TRUSTEES OF THE
UNITE HERE NATIONAL RETIREMENT FUND,
         Petitioners,

against

JANEF INC. a/k/a
MAYFLOWER MFG. CO. a/k/a
ALPERIN CO.,
         Respondent.



**PETITION TO CONFIRM
ARBITRATION AWARD**

08 CIV 5537

RECEIVED JUN 18 2008 U.S.D.C. S.D.N.Y. CASHIERS

STATE OF NEW YORK    )
                 ) ss.
COUNTY OF NEW YORK   )

      The Petition of the Trustees of the UNITE HERE National Health Fund and the Trustees of the UNITE HERE National Retirement Fund (hereinafter, the "Petitioners" or "The Funds"), by their attorney David C. Sapp, Esq., respectfully shows to this Court and alleges that:

      1.    I am Counsel to Petitioners herein, and am duly admitted to practice law before the Courts of the State of New York and before this Court and am fully familiar with the prior proceedings had in this matter. I submit this Petition in support of Petitioners' application for an Order confirming the Arbitration Award of Philip Ross (hereinafter, the "Arbitrator"), dated June 29, 2007. A copy of the Arbitration Award (hereinafter, the "Award") is annexed hereto as **Exhibit A**.

      2.    The Funds, with their sole offices at 730 Broadway, New York, New York 10003-9511, are employee benefit plans within the meaning of Section 3 (3) of the Employee Retirement Income Security Act of 1974, as amended (hereinafter, "ERISA"), 29 U.S.C. 1002 (3). The Funds were each established pursuant to an Agreement and Declaration of Trust. The Respondent is obligated to contribute to the Funds pursuant to a Collective Bargaining Agreement and Supplemental Agreements entered into between the Mid Atlantic Regional Joint Board, UNITE HERE (hereinafter, the "Union"), and employers in the men's and boy's clothing industry. The Funds were created to provide benefits to eligible employees of contributing employers. Employer contributions and income earned thereupon are the sole source of funding. The employees of the contributing employers do not contribute to the Funds through union dues or otherwise.

      3.    Janef Inc. a/k/a Mayflower Mfg. Co. a/k/a Alperin Co. (hereinafter, the "Respondent"), 3 Maxon Drive, Old Forge, Pennsylvania 18518, is a party to a collective bargaining agreement and supplemental agreement (hereinafter, the "CBA") thereto, with the Union. A copy of the CBA is annexed hereto as **Exhibit B**. The CBA obligates the employer to contribute to the Funds, based upon stated percentages of its gross payroll. The CBA also obligates Respondent to make available to the Petitioners payroll records required for the determination of Respondent's liability to the Petitioners.

4.    A dispute has arisen concerning Respondent's obligation to contribute to the Funds for the periods of May 22, 2006 through July 14, 2006 and December 11, 2006 through January 9, 2007. The Supplemental Agreement provides that all disputes under the CBA shall be submitted for arbitration and final determination.  Section 6A of the supplemental agreement provides that:

> Any controversy, claim, complaint, grievance or dispute arising out of or relating to the provisions of this Supplemental Agreement or the interpretation, breach, repudiation, application or performance thereof, or any controversy, claim, complaint, grievance or dispute arising out of or relating to the provisions of the Collective Bargaining Agreement as it may relate to eligibility for benefits under the Social Insurance Program, shall be referred by the Union, the Trustees or the Employer for arbitration and determination as hereinafter provided.

5.    Pursuant to the supplemental agreement, the dispute was referred to the Arbitrator for determination on June 29, 2007.

6.    Prior to the arbitration the Petitioners served a subpoena upon the Respondent directing it to produce its payroll records.  The Respondent failed to produce its books and records or to appear at the arbitration hearing.

7.    At the June 29, 2007 hearing, Petitioners presented the following evidence to Arbitrator Ross:

A.    The provisions of the CBA and supplemental agreement obligating Respondent to make employee benefit fund contributions to Petitioners and obligating the parties to arbitrate disputes, including disputes over delinquent employee benefit fund contributions (See Exhibit B);

B.    The Notice of Arbitration Hearing ("the Notice"), which was served on Respondent on June 4, 2007. A copy of the Notice is annexed hereto as **Exhibit C;**

C.    A subpoena duly served on Respondent, requiring Respondent to produce all books and records necessary to compute the exact sum owing to Petitioners by Respondent. A copy of the Subpoena is annexed hereto as **Exhibit D;** and

D.    An exhibit summarizing the Respondent's required contribution rates and the time periods during which the required contributions were not made by Respondent and the amounts due for those time periods. A copy of the summary sheet, which was considered by the Arbitrator, is annexed hereto as **Exhibit E.**

8.    As the record presented to the Arbitrator is a sufficient basis for the Award, the instant Petition complies with the standard for petitions to confirm established in D.H. Blair & Co., Inc. –v.– Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006).

9.    After considering the evidence presented at the hearing, the Arbitrator issued the Award directing the Respondent to pay the delinquent contributions to the Trustees of the UNITE HERE National Health Fund in the amount of $74,995.63, plus interest and incidental costs, for a total Award of $88,791.91. (See **Exhibit A**)

10.    After considering the evidence presented at the hearing the Arbitrator issued the Award directing the Respondent to pay the delinquent contributions to the Trustees of the UNITE HERE National Retirement Fund in the amount of $7,776.91, plus interest and incidental costs, for a total Award of $9,333.91. (See **Exhibit A**)

11.    On July 6, 2007, the Petitioners served a copy of the Award on the Respondent by certified mail, return receipt requested and regular mail.

12.    To date, Respondent has failed to satisfy any part of the Award.

13.    As a result of Respondent's failure to abide by the Award, the Petitioners now seek judicial enforcement thereof.  Pursuant to ERISA, this Court has jurisdiction over the Respondent.

14.    ERISA mandates an assessment of interest plus interest or liquidated damages. Accordingly, the Arbitrator in this matter awarded interest plus interest to Petitioners through the date of the Award.

**WHEREFORE**, Petitioners pray for an Order and Judgment:

A.    Confirming the June 29, 2007 Arbitration Award;

B.    Directing the entry of Judgment in favor of the Trustees of the UNITE HERE National Health Fund in the amount of $74,995.63 for delinquent contributions, $13,655.28 for interest to the date of the Award pursuant to ERISA Section 502(g)(2), $50.00 for the Arbitrator's fees, $16.00 for Auditor's fees and costs, and $75.00 for legal fees, all totaling $88,791.91, together with interest from the date of the Arbitration Award to the date of the Judgment, and the costs incurred in connection with this proceeding;

C.    Directing the entry of Judgment in favor of the Trustees of the UNITE HERE National Retirement Fund in the amount of $7,776.91 for delinquent contributions, $1,416.00 for interest to the date of the Award pursuant to ERISA Section 502(g)(2), $50.00 for the Arbitrator's fees, $16.00 for Auditor's fees and costs, $75.00 for legal fees, all totaling $9,333.91, together with interest from the date of the Arbitration Award to the date of the Judgment, and the costs incurred in connection with this proceeding;

D.    Such other further legal and equitable relief the Court deems appropriate.

Dated:  June 13, 2008
New York, New York

David C. Sapp, Esq. – DS 5781
Attorney for Petitioners
730 Broadway, 9th Floor
New York, New York 10003-9511
(212) 539-5576

# EXHIBIT A

In the Matter of
ARBITRATION OF DISPUTES

between

THE TRUSTEES OF THE
UNITE HERE NATIONAL HEALTH FUND AND
THE TRUSTEES OF THE
UNITE HERE NATIONAL RETIREMENT FUND,
Petitioners,

and

JANEF INC. a/k/a
MAYFLOWER MFG. CO. a/k/a
ALPERIN CO.,
Respondents.

**FINDINGS AND AWARD**
**07 – 07 – R**

Due notice having been given to the parties, a hearing was held before the undersigned in New York City on June 29, 2007.

A P P E A R A N C E S :

| | |
|---|---|
| The Arbitrator: | Dr. Philip Ross |
| For the Petitioner: | Mark Schwartz, Esq.<br>David C. Sapp, Esq.<br>Lawrence I. Kleinman<br>Evelyn Soto |
| For the Respondent: | No Appearance |

### FINDINGS

This proceeding was instituted by the service of a statutory Notice of Intention to Arbitrate, which alleged that Janef Inc., a/k/a Mayflower Mfg. Co., a/k/a Alperin Co. (hereinafter, the "Respondents"), had entered into a written Collective Bargaining Agreement and Supplemental Agreement thereto (hereinafter, the "Agreement"), with the Mid-Atlantic Regional Joint Board of the Union of Needletrades, Industrial and Textile Employees, presently known as UNITE HERE (hereinafter, the "Union"), and in which, pursuant to applicable law, the Respondents was notified that unless it applied to stay the proposed arbitration within 20 days after the service of the aforesaid Notice, it would be barred from putting in issue the making of the Agreement and its failure to comply therewith. More than 20 days have elapsed since the service of the aforesaid

Notice at the time of the hearing in this proceeding, held as above stated, and no application to stay this proceeding has been made by the Respondents.

On the basis of the aforesaid Notice of Intention to Arbitrate, Respondents failure to apply to stay this proceeding, and other evidence submitted[1], I find that, as alleged by The Trustees of the UNITE HERE National Health Fund ("Health Fund") and The Trustees of the UNITE HERE National Retirement Fund ("Retirement Fund") (hereinafter collectively, the "Petitioners"), the Respondents entered into the written Agreement with the Mid-Atlantic Regional Joint Board of the Union; and that the Agreement, among other things, provides that the Respondents are regularly to pay a stated percentage of their payroll to the Petitioners. These payments are commonly known as contributions.

The Agreement further provides as follows:

> The Employer shall furnish to the Trustees, upon request, such information and reports as they may require in the performance of their duties under any of the Agreements and declarations of trust.

A subpoena was duly served on the Respondents requiring it to produce at the hearing all of the relevant books and records from which could be computed the exact sums due to the Petitioners for the period of May 22, 2006 through July 14, 2006 and December 11, 2006 through January 9, 2007. The Respondents did not produce any of their books and records.

From the evidence made available to me, I find that the Respondents failed to make the following contributions for the period of May 22, 2006 through July 14, 2006 and December 11, 2006 through January 9, 2007 to the UNITE HERE National Health Fund in the amount of $74,995.63, and that demand for payment was duly made and refused, and that there is now due and owing from the Respondents to the Petitioner, The Trustees of the UNITE HERE National Health Fund, the sum of $74,995.63.

From the evidence made available to me, I find that the Respondents failed to make the following contributions for the period of May 22, 2006 through July 14, 2006 and December 11, 2006 through January 9, 2007 to the UNITE HERE National Retirement Fund in the amount of $7,776.91, and that demand for payment was duly made and refused, and that there is now due and owing from the Respondents to the Petitioner, The Trustees of the UNITE HERE National Retirement Fund, the sum of $7,776.91.

The Award which follows does not intend to and does not include any sums that may be due to the Petitioners for any period other than stated above, nor for any sums due to the

---

[1] The evidence I reviewed included (A) The Agreement; (B) A summary of the delinquent contributions sought in the arbitration; (C) The Notice of Intention to Arbitrate; (D) A subpoena duly served on Respondents.

Petitioners for the period stated above, and which would be shown upon an audit of the Respondents' books and records for such period, the results of such an audit not being available to me as Arbitrator due to Respondents' failure to comply with the Subpoena directed to it.

The aforesaid Agreement further provides:

> The Arbitrator shall also have the authority in such case as he shall deem proper to include in his award against the Employer the reasonable costs of collection, including, but not limited to the Arbitrator's fees, legal fees, interest, liquidated damages, auditing and accounting costs; providing, however, that no costs of collection shall be awarded against the Employer unless the said award shall also find that the Employer has failed to perform and comply with the terms and provisions of this Supplemental Agreement.

The Respondents having failed to perform and comply with the terms and provisions of the Agreement, as hereinabove found, and such default having resulted in expenditures for the Petitioners, I direct that the Respondents pay to the Petitioners, such expenditures as follows, each of which I find to be reasonable in amount: Arbitrator's fees of $50.00; legal fees of $75.00; auditing and accounting costs of $16.00; for total costs of $141.00 to be paid by The Trustees of the UNITE HERE National Health Fund and $141.00 to be paid by The Trustees of the UNITE HERE National Retirement Fund.

In addition, I direct that in compliance with the provisions of ERISA, Section 502 (g) (2), the Respondents pay to the Petitioners "interest on the unpaid contributions" plus "an amount equal to the greater of: (i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the [Petitioner's] plan in an amount not in excess of 20 percent." The Petitioners' plans do not provide for liquidated damages but provides for interest "at an annual rate equal to 2% plus 1/2 of the prime rate charged by Citibank on the first day of the calendar quarter at the due date of Payment." Because the Funds' plans do not provide for liquidated damages, the Funds are entitled to interest plus interest. Therefore, I direct that in accordance with the statutory formula, Respondents pay Petitioners, The Trustees of the UNITE HERE National Health Fund the sum of $13,655.28, in interest plus interest on delinquent contribution and The Trustees of the UNITE HERE National Retirement Fund the sum of $1,416.00, in interest plus interest on delinquent contributions which sums are hereby awarded against the Respondents in favor of the Petitioners.

3

## AWARD

Accordingly, it is hereby determined and awarded as follows:

1.     There is due and owing from the Respondents to the Petitioner, The Trustees of the UNITE HERE National Health Fund, the sum of $74,995.63, by way of unpaid contributions; the sum of $13,655.28, by way of interest plus interest provided for under ERISA, Section 502 (g) (2); the sum of $50.00 for Arbitrator's fees, the sum of $16.00 for Auditor's fees and costs and the sum of $75.00 for legal fees; for a total amount due of $88,791.91, in favor of the Petitioner Health Fund and which total amount the Respondents is to pay Petitioner Health Fund forthwith.

2.     There is due and owing from the Respondents to the Petitioner, The Trustees of the UNITE HERE National Retirement Fund, the sum of $7,776.91, by way of unpaid contributions; the sum of $1,416.00, by way of interest plus interest provided for under ERISA, Section 502 (g) (2); the sum of $50.00 for Arbitrator's fees, the sum of $16.00 for Auditor's fees and costs and the sum of $75.00 for legal fees; for a total amount due of $9,333.91, in favor of the Petitioner Retirement Fund and which total amount the Respondents is to pay Petitioner Retirement Fund forthwith.

I further direct that the sum of $100.00 in Arbitrator's costs be payable to the Arbitrator, $50.00 by the Petitioner Health Fund and $50.00 by the Respondents.

Dated: 6/29/07
New York, New York

_____
PHILIP ROSS, ARBITRATOR

**EXHIBIT B**

# AGREEMENT



BETWEEN

# JANEF, INC. t/a Mayflower * Alperin

# AND

# LOCAL 137 of the
# MID–ATLANTIC REGIONAL
# JOINT BOARD – UNITE

September 1, 2002 — August 31, 2005

FILE
137 Janef/Mayflower

Janef Inc. t/a  Mayflower * Alperin

| A. Basic Contract | | Page |
|---|---|---|
| I | Recognition | 1 |
| II | Check Off and Union Security | 2 |
| III | New Employees, Hiring & Terminations & Organizational Hiring | 3 |
| IV | Discharges | 3 |
| V | Rates of Pay | 3/4 |
| VI | Hours of Work | 5 |
| VII | Equal Division of Work & Seniority | 5 |
| VIII | Military Service | 6 |
| IX | Leaves of Absence | 6 |
| X | Holidays | 7/8 |
| XI | Vacations | 8/9 |
| XII | Bereavement Pay | 10 |
| XIII | Jury Duty | 11 |
| XIV | More Favorable Practices | 11 |
| XV | Insurance Fund | 12 |
| XVI | Contractors | 12 |
| XVII | Location of Factory | 13 |
| XVIII | Homework | 13 |
| XIX | Safety & Health & Other Committees | 13 |
| XX | Union Label | 14 |
| XXI | Arbitration | 14 |
| XXII | Strikes & Lockouts | 15 |
| XXIII | Compliance with Existing Law | 16 |
| XXIV | Applicable Law | 16 |
| XXV | Separability | 16 |
| XXVI | Modification in Writing | 16 |
| XXVII | Term of Agreement | 16 |

B. CONTRACT LANGUAGE FOR PARTICIPATION IN NATIONAL
    PLUS PLAN OF TEXTILE WORKERS PENSION FUND

C. ADDENDA

1. Charles Dispensa letter defining "Reasonable Excuse" for use in Holiday pay qualification.
2. Substance Abuse Policy

This agreement made this 1st day of September 2002 by and between Janef Inc. t/a Mayflower * Alperin (hereinafter referred to as the "Employer") and the Mid-Atlantic Joint Board of UNITE (hereinafter collectively referred to as the "UNION ").

## WITNESSETH

Whereas, the parties hereto desire to establish a standard of conditions under which the employees of the Employer shall work for the Employer during the term of this Agreement, and desire to regulate mutual relations between the parties hereto, with a view to securing harmonious cooperation between them and averting disputes.

Now, therefore, in consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

## ARTICLE I - RECOGNITION

Section 1. Bargaining Unit: The term "employee" as used in this Agreement means all the employees of the Employer wherever employed, excluding executives, administrative and clerical, supervisory employees, machinists, maintenance men and watchmen. No one in the aforesaid excepted categories may engage in production work, as a normal procedure.

Section 2. Exclusive Bargaining Representative: The Employer recognizes the UNION as the exclusive collective bargaining representative of its employees.

Section 3. Union Membership:
(A). Membership in the Union on and after the 30th day following the execution of this Agreement or the commencement of employment which ever is the latter, shall be required as a condition of employment.

(B). All employees who are now members or hereafter become members of the Union shall, as a condition of continued employment, remain members in good standing during the term of this Agreement.

Section 4. Union Representatives: The Employer shall recognize and deal with such representatives of the employees as the Union may elect or appoint and shall permit duly accredited representatives of the Union to visit this factory at any time during working hours, provided there is no interruption of production.

In addition, the parties reaffirm the Union's right to elect as many shop representatives as they wish in order for them to report to Union meetings and/or to the shop chairman (or vice chairman), for the shop chairman to discuss matters with the management. Any member of the Union may discuss a question with their supervisor.

Section 5. Records: The Employer agrees to make available to the Union all payroll and production records which the Union may require as the collective bargaining agent and/or contracting party hereunder.

1.

Section 6. Distribution of Union Materials:

(A). Bulletin Board - The Union shall have the right to post notices on a Bulletin board or boards to be located in each plant of the employer at mutually agreeable places, provided such notices first are submitted to the local plant office of the Employer for approval. The Employer agrees that approval shall not be unreasonably withheld.

(B). The Union and the Employer jointly agree that union material can and will continue to be available to employees from a table that is currently provided for that purpose in the employees' cafeteria. Both parties reaffirm the right of the Union to distribute material in non-work areas during non-work hours.

It is further understood between the parties that should there be occasion in the future for matters of concern on the distribution of union material, the appropriate labor and management officials will promptly take up the matter for review. This is being done in an effort to continue a positive relationship between the parties.

## ARTICLE II - CHECKOFF AND UNION SECURITY

Section 1. The Employer agrees to deduct at such intervals as may be agreed upon by the parties from the wages of each of its employees who have authorized the same, the prescribed dues and initiation fees and to remit the same as agreed upon deduction to the Union. Each authorization shall be in writing signed by the employee, and shall be delivered by the Union to the Employer. Sums deducted by the employer as Union dues or initiation fees shall be kept separate and apart from the general funds of the employer and shall be deemed trust funds.

Section 2. Voluntary checkoff of Political Contributions:

A. The Employer agrees to deduct from the wages of its employees who are Union members and who voluntarily authorize such contributions on forms provided for that purpose, contributions to Amalgamated Clothing and Textile Workers Union - Political Action Committee. The amount deducted pursuant to said voluntary authorizations shall be transmitted to the Treasurer of the ACTWU-PAC at monthly intervals. These transmittals shall be accompanied by a list of names of those employees for whom such deductions have been made and the amount deducted for each such employee.

B. The Union shall reimburse the Employer for any expenses incurred due to this provision.

Section 3. Union Security:

Where the Agreement requires membership in the Union as a condition of employment with reference to the effective or execution date of this Agreement, such reference shall be to the actual effective date of this Agreement, anything contained in the Agreement to the contrary notwithstanding. Where the Agreement requires as a condition of employment that employees remain members in good standing such reference shall be amended to require that those employees "remain members during the term of the Agreement to the extent permitted by law."

2.

## ARTICLE III - NEW EMPLOYEES, HIRING AND TERMINATIONS AND ORGANIZATIONAL HIRING

Section 1. Trial Period:  New employees shall be employed for a thirty (30) day trial period during which they may be rejected by the Employer and after which they shall become permanent employees. Except as otherwise expressly provided, employees on trial period shall be entitled to all the employee rights hereunder.

Section 2. Notification of Hiring and Termination:  The employer shall inform the Union as to all new employees hired and employees whose services have been terminated.

Section 3. Organizational Hiring:  The Employer agrees that it will hire employees who have been discharged from other employers during an organizing campaign conducted by the Union. The Employer is not required by this Section to hire an employee who is not qualified to perform the job that is being applied for. The Employer is not required to employ such applicants if it does not have jobs available. Any employee hired under this Section is subject to the Employer's regular probationary period for new employees. The Employer is not required to unlawfully give preference to employees applying under this Section. The Union will hold the Employer harmless for any liability, including but not limited to attorneys' fees, imposed by enforcement of this clause.

## ARTICLE IV - DISCHARGES

The Employer shall not discharge any employee except for just cause. The Employer shall promptly notify the representative of the Union of such discharge, and the reason therefore. In the event the discharge of an employee is considered unjustified by the Union, the Union shall within seventy two (72) hours of such discharge give notice to the Employer that the employee has been unjustly dealt with and the matter shall then be settled, adjusted or arbitrated, as provided for in this Agreement, and in the event the question is submitted to the Arbitrator who finds that the employee was unjustly discharged, he/she shall order re-instatement with back pay in such amount as, in his/her opinion the circumstances warrant.

## ARTICLE V - RATES OF PAY

Section 1. Rate of Pay:
A.    The Employer agrees to pay its employees on a prescribed day each week.

B.    Wage Increases:
    (i) Effective March 1 2004, the Employer shall grant a wage increase of $.25 cents per hour to all time rate employees and shall incorporate an increase of $.25 cents per hour in all existing piece rates.

    (ii) Effective March 1, 2005, the Employer shall grant a wage increase of $.25 cents per hour to all time rate employees and shall incorporate an increase of $.25 cents per hour in all existing piece rates.

    (iii)  Effective September 1, 1999, $.05 per hour worked will be contributed into the National "401K" Plan by the Employer and $.05 per hour worked will be contributed by the Employee/Member.  (See Section B of this contract.)

Section 2. Adjustment in Individual Rates: Whenever new methods of production or new articles of manufacture are introduced, the Employer shall pay to each employee his/her average hourly earnings or an incentive rate which will reasonably maintain the average of the operation. New piece rates shall maintain the average earning of the employees prevailing at the time that the operation is changed or new operation begun, subject to negotiation.

Section 3. Stability of Piece Work Earnings: The Employer agrees to maintain conditions which will enable the individual piece-workers to enjoy reasonably stable hourly earnings.

Section 4. Transfers: If an employee is temporarily transferred from one job or operation to another at the request of the Employer while there is work performed on his/her own job, he/she shall, while working on the job or operation to which he/she has been transferred, be paid his/her average earnings prevailing at the time of his/her transfer or his/her piece rate earnings on the operation, whichever are greater. If an employee is temporarily transferred at the request of the Employer when there is no work available on his/ her own job or at his/her own request, he/she shall, while working on the job or operation to which he has been transferred, be paid the midpoint between the minimum rate in effect under the Fair Labor Standards Act at the time of such transfer and his/her average earnings prevailing at the time of the transfer or his/her piece rate earnings on the operation, whichever are greater. The conditions to apply upon permanent transfer shall be mutually agreed upon by the Employer and the Union at the time of such transfer.

Section 5. Pay for Reporting Time: Employees who report for work at their regular starting hour, in the absence of notice from the Employer to the contrary, or at an hour designated by the employer, shall be paid at their established hourly or piece rate earnings for all work between the hour they report for work and hour they are dismissed for the day, but in no event for less then four (4) hours, provided, however, that this clause shall not apply is cases of power failure, fire or other cause over which the Employer has no control. Failure of other employees to report for work shall not be considered as a "cause over which the Employer has no control" unless the Employer has taken reasonable and adequate steps to train and provide relief workers and an acute emergency arises which the Employer could not foresee.

Section 6. Waiting Time: Any waiting time on account of machine breakdown or lack of work amounting to fifteen (15) consecutive minutes or more per day shall be compensated at the affected employee's average hourly rate. An employee shall not be entitled to waiting time until and unless he/she notified his/her supervisor of the lack of work or machine breakdown. In the event an employee's machine breaks down he/she shall not be credited with waiting time if he/she refuses to work at another machine assigned to him/her. This provision shall not be subject to abuse.

## ARTICLE VI - HOURS OF WORK

Section 1. The regular hours of work for all employees, except mechanics, watchmen, firemen, and maintenance men covered by this Agreement, shall be not more than eight (8) hours in any one day from Monday to Friday inclusive. The daily schedule of hours shall be mutually agreed upon by the Employer and the Union. All work in excess of eight (8) hours in any one day and all work on Saturday shall be regarded as overtime and paid for at a rate of time and one half. Double time shall be paid for all work performed on Sunday (except above excluded employees) irrespective of the number of days or number of hours worked during the week except when such work is occasioned by Act of God, such as fire, flood or mine cave, in which event it shall be paid at a rate of time and one half.

Section 2. In allocating overtime work on any job or operation, preference shall be given to employees regularly employed on such job or operation. This provision shall not apply to overtime for utility operators.

Section 3. The Employer agrees to give reasonable notice to the employees and the appropriate union representative when overtime is to be worked.

Section 4. Existing practice with reference to rest periods shall continue as heretofore unless otherwise mutually agreed upon by the parties.

## ARTICLE VII - EQUAL DIVISION OF WORK AND SENIORITY

Section 1. In the event the Employer should not have enough work to keep all his employees working full time, then such work as may be available shall be equally divided among the employees, as far as is practicable before lay-offs become necessary.Lay-offs and recall to work after lay-off shall be governed by length of service, preference being given to those employees who have been employed longest by the Employer in their own operation.Employee shall remain on the Seniority Roster for six (6) months to be re-called on his/her job or any vacant job.

Section 2.
(A). Job Vacancies. On job vacancies those then out of work shall be given first preference by length of service, and those then employed shall be given second preference by length of service over hiring from the outside, provided the Employer shall determine that it would be practical to do so in order to maintain production throughout the plant.

(B). Equal Division of Work - Layoff. (1). Whenever there is a temporary period of insufficient work, the available work shall be divided substantially equally insofar as is practicable among all regular employees of the Employer, for a reasonable length of time. Layoffs and recall to work after layoff shall be governed by length of service on the job or operation involved, preference being given to those employees with the greatest length of service. If a layoff is necessary, the Employer shall first allow those volunteering for layoff to do so, in order of job or operational seniority.

**Section 3.** Promotions to better time work jobs shall, unless mutually agreed otherwise, be made, as herein provided from the employees. All other things being substantially equal, the employee with the greatest length of service shall be preferred. Promotions may be made on a departmental basis, however, if the Employer and Union agree thereto. This paragraph shall not apply to promotions to supervisory jobs.

## ARTICLE VIII - MILITARY SERVICE

In the event that an employee is conscripted into the armed forces of the United States or is called into service as a member of the National Guard or Army or Navy Reserves, he/she shall, upon his/her discharge from service, be reinstated to his/her former position with the Employer with all rights and privileges enjoyed by him/her at the time he/she entered service; provided, that he/she shall request such reinstatement within such period as be permitted by law after his/her discharge from service and that the duties of such person are still being performed in the operation of the Employer's business. It is further provided that the Employer shall have the right to discharge any person hired by reason of the entry into military service of the person so reinstated. The status of employees, if any, affected by the reemployment of the returned service person shall be determined by the terms of the seniority provisions of the Agreement.

## ARTICLE IX - LEAVES OF ABSENCE (INCLUDING PARENTAL/MATERNITY LEAVE)

Reasonable leave of absence in writing shall be granted an employee upon request for reasonable cause. Such leave of absence shall be subject to the approval of the Union. An employee on leave of absence shall be reinstated to his or her previous job, or operation when practicable upon return to work.

(a) It is understood that the provisions of the Leave of Absence Clause of the Agreement applying to "personal illness" include "pregnancy" and/or "maternity".

(b) Notwithstanding anything to the contrary in the existing Agreement, no leave for personal illness or injury, as defined above, shall be granted to any employee prior to completion of three (3) months of employment, nor for a period of more than twenty six (26) weeks, except where mutually agreed upon by the local Union and the Employer. Leave of absence when authorized for personal reasons shall be limited to ten (10) weeks except where mutually agreed upon by the local Union and the Employer.

(c) Parental/Maternity Leave : An employee may receive six (6) weeks of unpaid parental leave within any two year period to attend to the employee's seriously ill or newborn child.

(d) Union Leave:

(1). Leave of absence without loss of seniority shall be granted to a reasonable number of employees selected to act as representatives of the Union, or as delegates to conventions, conferences and other similar functions. Such employees shall be reinstated to their respective previous jobs, operations or machines upon return to work, provided that the leave is two (2) weeks or less. An employee on leave of absence as a delegate to a convention, conference or other similar function shall be entitled to holiday pay for any holiday which occurs during such leave. The Employer reserves the right to deny a leave if the same shall unnecessarily affect production..

6.

## ARTICLE X - HOLIDAYS

Section 1.  Number of Holidays:  Employees shall receive the holidays set forth below with pay irrespective of the day of the week on which the holiday falls:

| | |
|---|---|
| NEW YEARS DAY | MARTIN LUTHER KING JR. DAY (see local rule) |
| GOOD FRIDAY | EASTER MONDAY |
| MEMORIAL DAY | INDEPENDENCE DAY |
| LABOR DAY | THANKSGIVING DAY |
| CHRISTMAS DAY | FRIDAY AFTER THANKSGIVING |
| FLOATING HOLIDAY (PRESIDENT'S DAY, See Local Rule*) | |

Should any of the holidays fall on Sunday, the date celebrated as such shall be considered the holiday.

(A).  Local Rule:
        (1.)  There will be a Personal/Sick Day in  celebration of Martin Luther King Day which is now a work day.  Anyone participating in celebration of Martin Luther King Day will be excused from work.

        (2.)  Presidents' Day shall be a work day, with another day to be substituted as follows:

                a.  When Christmas falls on Sunday, Monday, Tuesday or Wednesday, the paid holiday will be a Personal/Sick Day instead of Presidents' Day.

                b.  When Christmas falls on a Thursday, Friday or Saturday, the additional paid holiday in lieu of Presidents' Day will be the working day before Christmas vacation.

        Note:  Some years will have 2 Personal Days, some years will have only one Personal Day.

        (3.)  Personal Days are available each calendar year (Jan. 1 - Dec. 31).  Anyone who does not claim their Personal/Sick day(s) will be paid for them at the end of the year.

        (4.)  New Hires will accrue Personal/Sick days after 3 months employment (1 day) and 6 months employment (1 day) from date of hire.

        (5.)  Any unused accrued Personal/Sick days will be paid in the event of separation.

Section 2.  Eligibility:
        (a) Plant shutdowns shall not relieve the Employer of the holiday pay obligations herein provided unless the Employer's factory is shut down in all its manufacturing department for five (5) consecutive weeks as follows:

7.

(1). The entire (2) two weeks immediately preceding the week in which such paid holiday occurs; and

(2). The entire week during which such paid holiday occurs; and

(3). The entire two (2) weeks immediately following the week in which such paid holiday occurs.

(b). An employee absent from work because of personal illness certified by a doctor's certificate shall be entitled to holiday pay unless such employee is ill for three full consecutive weeks as follows:

(1). The entire week immediately proceeding the week in which such paid holiday occurs; and

(2). The entire week during which such paid holiday occurs; and

(3) The entire week immediately following the week in which such paid holiday occurs.

(c). Any employee who is absent from work without reasonable excuse on the work day before or the work day after a holiday shall not be entitled to holiday pay.

<u>Tandem or Consecutive Holidays -</u> The "day before and after" rule shall apply to all holidays with the exception that, should separate holidays fall either simultaneously or successively,  an employee absent, (without reasonable cause as heretofore defined), either the day before or the day after, shall lose only one of the holidays. In the event an employee is absent (without reasonable cause as heretofore defined), both the day before and the day after, the employee shall lose holiday pay for all intervening holidays.

(d) An employee shall not be entitled to holiday pay unless he or she has been employed thirty (30) days.

<u>Section 3.  Holiday Pay</u> for time workers shall be eight (8) times the employees current hourly rate. Holiday pay for piece workers shall be eight (8) times the employee's straight time average hourly earnings for the thirteen (13) week period prior to the week in which the holiday occurs.

## ARTICLE XI - VACATIONS

<u>Section 1.  Vacation Period:  Summer-</u> It is mutually agreed that there shall be a vacation period for employees entitled to vacation pay as hereinafter provided of the first two consecutive weeks of July, the first to be the week in which July 4th falls in each year unless the Employer and the Union shall mutually agree upon some other two consecutive weeks during the summer months. In the event that a paid holiday falls within the vacation period, employees entitled to holiday pay shall be entitled to such holiday pay in addition to vacation pay.

The Employer shall give employees reasonable notice of any change in the schedule of a vacation period.

8.

The Employer with prior agreement with the Union may designate other periods for vacation purposes during the summer months for those employees primarily involved in shipping, receiving, plant layout, maintenance or mechanical work, watchmen or firemen work in order to serve the needs or security of the plant.

Winter - It is mutually agreed that there shall be a vacation period to be held the week in which either Christmas or New Year's Day falls, with pay consisting of 5 days, in addition to holiday pay.

Fourth Week Vacation - Employees with 20 years of seniority as of January 1 in each year, shall be entitled to a fourth (4th) week of paid vacation to be taken during the ensuing twelve (12) months. The schedule of vacation shall be fixed by mutual agreement in accordance with the needs of production, and individual employees may bid for an available week in order of last hire date plant seniority. If mutually agreed to at the local level, an employee may elect to work during his/her week of vacation at straight time in addition to vacation pay. The amount of time off and pay shall be the same as the preceding Winter vacation.

Eligibility for the fourth week vacation will include service with a prior employer who was purchased by an Employer herein provided; the prior Employer's employees were represented by the Union; no significant hiatus existed between the closure of the plant by the prior Employer and the resumption of operations by the Employer herein; this clause will not apply where there was an agreement or understanding at the time of the purchase between the Employer and the Union that the employees would start as new employees, without seniority.

Section 2. Eligibility : Each employee shall receive vacations with pay in accordance with the following requirements:

      (I)      On completion of 1 year of service, 1 week vacation at the next ensuing regularly scheduled vacation period (either winter or summer, whichever comes first).

      (II)      On completion of 2 years of service, 2 weeks of summer vacation except that an employee who first becomes eligible for two weeks of vacation prior to the winter vacation shall receive one week of winter vacation and one week of summer vacation.

      (III)      On completion of 3 years of service, 2 weeks of summer vacation and 1 week of winter vacation.

An employee otherwise eligible for a paid vacation shall not be deemed off the payroll because of the fact that he is temporarily laid off, ill, on authorized leave of absence or in the armed forces at the commencement of the vacation period. The arbitrator hereinafter designated is empowered to determine whether an employee, discharged prior to the commencement of a vacation period, but otherwise eligible for a paid vacation, shall be entitled to a vacation pay.

9.

An employee on authorized leave of absence at the commencement of the vacation period shall not be entitled to vacation pay until and unless he/she returns to employment. The rights of an employee in the armed forces at the commencement of the vacation period shall be as governed by applicable statute.

In the event that the operations of the Employer are terminated prior to the commencement of the vacation period for any reason whatsoever the Employer shall be liable for vacation pay pro-rated to the date of the termination of operations. In such event vacation pay shall be paid immediately upon the termination of operation or as soon thereafter as the vacation payroll can be prepared.

Section 3. Computation of Vacation Pay: In the case of week workers, one (1) week's pay shall be the employee's current weekly rate; in the case of piece workers, the first week of summer vacation or the week of winter vacation shall be forty (40) times the employee's average hourly earnings, and to employees eligible thereto the second week of summer vacation shall be two and one half (2 1/2) percent of the employee's gross earnings for the fifty two (52) week period commencing with the week in which June 1st falls in the prior calendar year, provided however, the second week's vacation pay to piece workers shall not exceed the first week's vacation pay.

Average hourly earnings for computing the first week's vacation pay to piece workers means the average hourly earnings for the first calendar quarter of the year adjusted for any general change in wages which shall have been made subsequent to such calendar quarter. The Winter vacation is always paid at the same rate as the first week falling in the summer.

Where an employee has not been employed during the first calendar quarter of the year, or has not worked regularly on his/her regular operation during such period, the Union and the Employer shall mutually agree upon some other representative period. With reference to the provisions of the Agreement dealing with vacations and paid holidays, an employee who has been permanently and formally scheduled to work more or less than eight (8) hours a day shall be compensated for vacation and holidays on the basis of the daily schedule of hours which such employee is permanently and formally scheduled to work.

## ARTICLE XII - BEREAVEMENT PAY

A. An employee who has been on the payroll of the Employer for six (6) months or more shall be granted bereavement pay in the event of a death in his/her immediate family.

B. The immediate family is defined as the employee's father, mother, sister, brother, spouse, children, grandparent, grandchild, father-in-law, mother-in-law, son-in-law, daughter-in-law, step-child or step-parent.

C. Bereavement pay shall be based on the employee's daily time or piece rate earnings as established for the purpose of holiday pay.

10.

D. Bereavement pay for the death of a member of the immediate family, as previously defined, shall be paid for the day before, the day of, and the day following the funeral when these days fall on days the employee would otherwise have worked. Should the employee receive notice of the bereavement subsequent to any of the aforesaid days, the employee shall be entitled to the same number of days off with pay as he would have received if notice had been timely.

E. No bereavement pay will be granted unless the employee notifies the Employer and requests leave. At his discretion, the Employer may require evidence of death and kinship.

## ARTICLE XIII - JURY DUTY

An employee who has completed the probationary period and who is called for involuntary trial jury duty will be paid the difference between the employee's time rate or average hourly piece rate earnings, as established for the purpose of holiday pay, multiplied by the hours such employee would otherwise have been scheduled to work and the net of any payment received (excluding reimbursement for out-of-pocket expenses) for time spent on jury duty. The employee shall present to the Employer all records of such jury service received from the public authorities. If the Employer deems it necessary to have the employee excused from jury duty, the Union and the employee agree to cooperate in seeking to have the employee excused.

## ARTICLE XIV - MORE FAVORABLE PRACTICES

Anything in this agreement to the contrary notwithstanding, any custom, working condition or practice, including (but not limited to) rates of wages, hours of work, holidays and vacations, followed by the Employer at the time of the effective date of this Agreement, which custom, working condition or practice is more favorable to the employees than the terms of this Agreement shall be continued heretofore with the same force and effect as though specifically provided for herein.

### Equal Rights:

A. The Employer and the union shall not discriminate nor perpetuate the effects of past discrimination, if any, against any employee or applicants for employment on the account of race, color, religion, creed, sex, or national origin. This clause shall be interpreted broadly to be co-extensive with all federal, state or local anti-discrimination laws and where available, judicial interpretations thereof.

B. Representatives of the Employer and the Union, designated for that purpose at the national level, shall meet to review compliance with this provision and to mutually agree upon such steps as are necessary to achieve compliance. If, upon failure to so mutually agree, either party invokes the arbitration procedures of the Agreement to resolve the dispute, the Arbitrator shall fashion his award to grant any and all relief appropriate to effectuate this Article.

C. Review of local procedures in individual plants or localities shall be undertaken by the Employer and the Union following conclusion of national negotiations to examine compliance with the "Equal Rights" clause of this Agreement.

11.

Issues concerning possible non-compliance in any plant or locality shall be taken up at the local level in the first instance by representatives of the Employer and Union designated for that purpose at the national level. In the event of inability to agree on procedures and/or contractual modifications necessary to secure full compliance with the Equal Rights clause the matters shall be referred for review at the national level.

In the event of failure to agree, resolution of the issue shall be referred to final and binding arbitration under the terms of the Agreement. The Arbitrator shall have the power and authority to modify, if necessary, existing seniority, promotion. job bidding and transfer provisions and practices so that each complies with the Equal Rights clause of the Agreement; to the extent permissible, all existing local procedures shall be continued.

## ARTICLE XV - INSURANCE AND RETIREMENT FUND

The provision of the supplemental agreement annexed hereto and marked exhibits B and C whereunder the Employer agrees to contribute to the Amalgamated Cotton Garment and Allied Insurance Fund is incorporated herein.

A. The Employer agrees to pay to the Amalgamated Cotton Garment and Allied Industries Fund (providing insurance benefits) and to the Amalgamated Cotton Garment and Allied Industries Retirement Fund the appropriate designated percentages of the gross wages payable for each pay period, excluding vacation and holiday pay, as called for in the Supplemental Agreement.

B. The employer also agrees to make contributions to Mid-Atlantic Region Health Fund one dollar per member per year.

C. The parties recommend and request that the Union Trustees and the Employer Trustees of the Amalgamated Cotton Garment and Allied Industries Fund conduct a joint study of the pension program.

## ARTICLE XVI - CONTRACTORS

Section 1 -  The Employer shall not cause or permit any work to be performed for it, directly or indirectly, by any contractor or manufacturer not in contractual relations with the Union except in emergency, and then consent of the Union. In the event the Employer desires to employ such contractor or manufacturer, it shall give notice to the Union by registered mail.

It is agreed that imports are within the scope of the contracting out clause of the Agreement.

Section 2 - In the event of any violation of this Article, the Union shall be free to take such action, including strikes or stoppages, as it deems appropriate to cause the Employer to cease such violation, anything in the Agreement to the contrary notwithstanding.

## ARTICLE XVII - LOCATION OF FACTORY

The Employer shall not during the period of this Agreement move its factory to any place distant more then twenty five (25) miles from its present location without the consent of the Union. Nor shall it establish any new shop or factory in addition to those which it now operates, unless such new shop or factory operates under agreement with the Union and provided further the operation of such new shop or factory shall not result in diminution of employment to the employees in the employer's present factories. In such case, operations shall be curtailed in such shops or factories to the extent necessary to provide the present level of employment to the employees in the plants presently covered by the Agreement.

## JOB SECURITY

Because of the mutual concern to promote job security by discussion of problems, the Union will assist when possible, the Employer's efforts to obtain and maintain steady work for its' employees, and to facilitate such efforts and discussion in the event the Employer experiences circumstances which may require discontinuing its operations or closing one or more of its plants, the Union shall be informed so that there can be joint discussion of the problem. In the event of the Employer's willful failure to give such notice to the Union, the Union may refer such alleged willful breach to arbitration and the arbitrator may award damages to the affected employees. If attempts to avert the plant closure are not successful, the Employer and the Union shall meet to negotiate on the impact of such closure on the employees.

## ARTICLE XVIII - HOMEWORK

None of the Employer's work shall be performed on a homework basis.

## ARTICLE XIX - SAFETY AND HEALTH STUDY AND OTHER COMMITTEES

A. Whereas eliminating occupational safety and health hazards for employees in the Industry is to the mutual benefit of the Employers and the Union, the parties to this Agreement shall form and maintain a joint National Labor - Management Safety and Health Study Committee.

B. The Committee shall be composed of equal numbers of representatives selected by the Association and by the Union.

C. The Committee shall hold meetings as often as necessary for the purpose of developing the means and structure to undertake joint safety and health studies to analyze occupational safety and health hazards in the Industry and to suggest appropriate measures for control of such hazards.

D. Safety and Health Committee - The Union and the Employer shall establish in each plant a workplace Safety and Health Committee to facilitate compliance with all state and federal laws on the subject. It will meet regularly at time and place to be determined by local management after consultation with the Union. The employees shall be paid their established time rate or piece rate average by the Employer while attending the meeting. In addition the joint Union-Management Study Committee shall include in its agenda workplace safety and health issues of industry wide-impact.

13.

E. Child Care Committee - The Employer and the Union agree to cooperate at the community level to study the feasibility of making available child care facilities.

F. Joint Labor-Management Study Committee - The Employer members of the Cotton Garment Negotiating Group and the National Office of the Union shall establish a Cotton Garment Industry Joint Labor-Management Committee to study such issues of national concern as they shall consider of joint interest. The Committee shall meet regularly during the term of this Agreement.

G. National Health Insurance - The inflationary spiral affecting health care costs in the United States has caused the parties concern over the continued viability of their insurance program. Therefore, the parties agree that it would benefit the insurance program and the employees who are covered by this Agreement if an appropriate National Health Insurance Program is enacted. It is further agreed that the Joint Labor Management Committee shall meet to determine the best way to mount a joint campaign in support of the establishment of an appropriate National Health Insurance Program and to implement such a campaign.

H. Retirement Plan Review - A Committee of representatives of the Union and the Employers has been appointed to study and review the structure, funding and benefits (both in amount and method of payment) of the present Retirement Plan to determine the adequacy of the same in light of present Industry conditions and, should they agree, shall have the authority to direct the Trustees to modify the present plan, to transfer, merge or move the same to one or more overfunded plans or to establish a substitute or additional plan or plans of retirement. The parties hereto agree to accept the agreement of the said Committee and, should the same result in a distribution of the contributions in a manner different than herein provided, or an increase or decrease thereof, to conform thereto.

## ARTICLE XX - UNION LABEL

The parties acknowledge that the issue of the use of a Union label, and the royalty therefore, if any, is subject to further study and negotiations between the Union and the Association. The Employer agrees to accept and be bound by the Committee's report and/or the Arbitrator's award.

## ARTICLE XXI - ARBITRATION

Section 1. Any complaint, grievance or dispute arising out of or relating directly or indirectly to the provisions of this Agreement, or the interpretation or performance thereof, shall in the first instance be taken up for adjustment between the representatives of the Union and Employer or Employers and, if they are unable to adjust the same, the matter shall be referred for arbitration and determination to _____ who is hereby designated as the Arbitrator under this Agreement. In the event the Arbitrator herein designated is unable to serve or if none is designated in the Agreement, either party may petition the American Arbitration Association for appointment of an arbitrator in accordance with their rules and regulations.

14.

Section 2. The decision, order, direction or award of the Arbitrator shall be final, conclusive and binding and enforceable against any of the parties to this Agreement in a court of competent jurisdiction.

In addition to the powers which the Arbitrator may possess pursuant to this Agreement or by operation of law, it is expressly agreed that in the event of any breach or threatened breach of this Agreement, the Arbitrator may after a hearing issue an award providing for a mandatory direction or prohibition. Without limitation upon the foregoing, if members of the Union have been injured by a violation of this Agreement, the direction, prohibition, order or money damages equal to the earnings of which the Union members were deprived may be made to run in favor of the Union. The parties consent that any papers, notices or process, including subpoenas, necessary or appropriate to initiate or continue an arbitration hereunder or to enforce or confirm an award, may be served by registered mail directed to the last known address of the Employer and the Union. The service of any other notice is hereby expressly waived. Any party or his/her representative may call such arbitration hearing on giving five (5) days notice to the Employer and the Union. The Arbitrator, however, may call a hearing on such notice as he/she deems appropriate. The parties hereby expressly agree that the oath of the Arbitrator is waived and consent that the Arbitrator may proceed with the hearing on this submission. In the event a party to arbitration shall default in appearing before the Arbitrator, the latter is empowered to take the proof of the party appearing and render an award thereon.

Section 3. The procedure established in the Agreement for the adjustment of disputes shall be the exclusive means for the determination of such disputes, including strikes, stoppages, lockouts and any and all claims, demands and acts arising therefrom, except as expressly provided otherwise in this Agreement. No proceeding or action in a court of law or equity or administrative tribunal shall be initiated other than to compel arbitration or to enforce awards. This Article shall constitute a complete defense and ground for a stay of any action or proceeding instituted contrary thereto.

Section 4. In the event that a party fails to comply with a decision or award of the Arbitrator within ten (10) days after service of a copy thereof, the other party shall be immediately free to call a strike, stoppage or lockout as the case may be.

Section 5. Wherever it is provided that the parties shall "mutually agree" or similar language is used, the parties do not so agree, the matter may be submitted to Arbitration.

## ARTICLE XXII - STRIKE STOPPAGES & LOCKOUTS

Section 1. Strikes, stoppages and lockouts are prohibited except for those causes specifically set forth in the Agreement. The Arbitrator shall have the power to impose appropriate discipline for a violation of this provision. If a strike, stoppage, or lockout occurs, the aggrieved party shall have the right to demand an immediate hearing before the Arbitrator on four hours notice.

Section 2. Anything contained in Section 1 of this Article to the contrary notwithstanding, in the event that the Employer does not pay the employees on the date due their wages, holiday pay, vacation pay and any other compensation owed them, the Union shall be free to order a stoppage of work in the shop of the Employer until such time as all sums owing are paid. Action taken by the Union pursuant to this section shall in no way abrogate the terms or effects of this Agreement.

15.

## ARTICLE XXIII - COMPLIANCE WITH EXISTING LAW

The Employer agrees to keep his/her shop in a sanitary condition and agrees to comply with all Federal, State and Municipal laws affecting payment of wages, rates of pay and working conditions and employment.

## ARTICLE XXIV - APPLICABLE LAW

All questions relating to the interpretation or enforcement of the Agreement including without limitation, its validity, execution or performance thereunder shall be governed by the laws of the State of Pennsylvania.

## ARTICLE XXV - SEPARABILITY

If any provision or part thereof of this Agreement is in conflict with any applicable federal or state law or regulation, such provision shall be deleted from this Agreement or shall be deemed to be in effect only to the extent permitted by such law or regulation. In the event that any provision of this Agreement is thus rendered inoperative, the remaining provisions shall nevertheless remain in full force and effect.

## ARTICLE XXVI - MODIFICATION IN WRITING

This Agreement shall not be modified, except by written stipulation signed by the signatories hereto, or except as provided elsewhere in the Agreement.

## ARTICLE XXVII - TERM OF AGREEMENT

A. Either party may request at any time or times during the term of this Agreement conferences for the purpose of Agreeing upon revision of wages, including all economic fringe items, and hours. The party to whom a request for a conference is made is obligated to participate in such a conference. In the event that the parties are unable to agree within thirty (30) days after request for such a conference, the matter shall be submitted to arbitration. The decision of the Arbitrator shall be final and binding.

B. This Agreement shall be binding upon the parties hereto and their successors in interest and shall be effective upon the date hereof and shall remain in full force and effect until midnight August 31, 2005. It shall continue in full force and effect thereafter, unless either party gives written notice on or before June 30, 2005 or June 30 of any year thereafter, by certified mail, that it desires to terminate or modify the Agreement, in either of which event, the Agreement shall terminate on midnight on the ensuing August 31st.

16.

IN WITNESS WHEREOF, the Employer and the Union have executed this Agreement to be executed by their duly authorized officers the day and year first above written.

Janef Inc. t/a/ Mayflower * Alperin                    Mid Atlantic Joint Board of UNITE!
Employer

By _____                    By _____
Jane Alperin                                                   Harold Bock
Title   Chairman of the Board                          Title   IVP/ Mid-Atlantic Region Director

Address of Employer:

_1 Maxson Drive  Old Forge, PA  18518_
City, State, Zip                                                Local Negotiating Committee:

_____
Maggie Genovese

_____
Trudy Delawder

_____
Danny Cicchillo

_____
Carol Hunter

_____
Mary Ann Arnold

_____
Paulette Chemchick

# CONTRACT LANGUAGE FOR PARTICIPATION IN NATIONAL PLUS PLAN
## OF
## TEXTILE WORKERS PENSION FUND

Effective September 1, 1999 the Employer shall deduct from the wages of its employees upon authorization of an individual employee, upon a form provided for that purpose by the Textile Workers Pension Fund, such sums as the employees shall individually designate as their contribution to the National Plus Plan, 401K pursuant to the provisions of the Collective Bargaining Agreement between the Employer and the Mid-Atlantic Regional Joint Board of the Union of Needletrades, Industrial and Textile Employees. The minimum employee payroll deduction shall be $.05 per hour.

The Employer agrees to contribute to the Fund on behalf of each employee covered by the Collective Bargaining Agreement $.05 per hour for all hours worked. The Employer also agrees to forward to the Fund the amounts deducted and Employer contributions on or before the tenth of each month, for all payroll weeks ending in the prior calendar month, a list showing the names and social security numbers of all employees who are contributing to the Plan during the period covered, the amount of each employee's and employer contributions and the resulting contributions due. All contributions shall be payable to the National Plus Plan and shall be submitted to the Fund Office.

The foregoing obligations to the National Plus Plan shall be subject to the enforcement, auditing and collection procedures of the National Plus Plan conducted by the staff of the Fund now enforceing the insurance contribution obligation to which the Employer is a party.

The Employer shall provide to the Textile Workers Pension Fund, on a timely basis, information the Textile Workers Pension Fund reasonably requests for the purpose of conducting non-discrimination testing for the National Plus Plan.

In the event of an alleged breach of the Employer's obligations under this Article either the Fund or the Union may institute proceedings to collect any arrearage. These proceedings may utilize the Grievance and Arbitration procedures contained in the Collective Bargaining Agreement.

Amalgamated Clothing Workers
of America

Scranton and Wilkes-Barre District Joint Board

Scranton 3, Pa.

Sir:

With reference to Article V, Section 2 (c) and Article VI Section 3
of the collective bargaining agreement, dated September 1, 1956, it is
impossible to submit a definitive and complete list of causes which
might be included in the term "reasonable excuse". "Reasonable excuse",
however, includes the following:

    (1)  Personal illness of the employee or serious illness
        in his immediate family. The Employer may request a
        doctor's certificate or other adequate proof thereof.

    (2)  Death in the immediate family of the employee.

    (3)  Excused absence by the Employer for any reason.

    (4)  Absence from work because work is unavailable.

The foregoing constitutes the most frequent types of "reasonable
excuse." These instances of "reasonable excuse" may be taken up and
settled at the local level by the local management of the Employer
and the plant representative of the Union.

There are other types of "reasonable excuse" which may occassionally
arise. These instances, if not settled at the local level, may be
taken up for settlement by a representative of the General Office of
the Union and a representative of the general management of the
Employer.

Irregardless of what is contained in the aforesaid collective bargain-
ing agreement to the contrary, it is understood and agreed that the
employer at any time during the term of this agreement or any renewal
thereof shall have the right to retire from business and/ or to sell and/or
to lease its entire business in which event this contract shall cease
and determine, and the employer shall be released from all obligation and
liability thereunder and just as though this contract has never been made.

Amalgamated Clothing Workers of America

By _Charles Seistenson_
              Manager

**SUBSTANCE ABUSE POLICY**

As part of Janef Inc. commitment to safeguard the health of its' employees, to provide a safe place for its' employees to work, and to supply customers with the highest quality products possible, this policy establishes the Company's position on the use or abuse of alcohol, drugs or other psychoactive substances by its' employees. Because substance abuse, either while at work or otherwise, can seriously endanger the safety of employees and render it impossible to manufacture top quality products, the Company has established this policy to detect users and remove abusers of alcohol, drugs, or other psychoactive substances from the work place. It is also the policy of the Company to assist employees in overcoming any dependence on drugs and/or alcohol.

All employees are to be informed of the Company's drug and alcohol policy and made aware of its' contents. In addition, employees shall be given a copy of the Company's drug and alcohol policy and asked to sign the accompanying acknowledgment of receipt (Attachment "A"). New employees will be informed of the existence of this policy.

Employees are encouraged to approach representatives of the Human Resources Department of Supervisors or Management with any questions they have about the Company's drug and alcohol policy.

It is a violation of Company policy for an employee to use, sell, possess, manufacture, distribute, or purchase drugs or alcoholic beverages on Company property. It is also against Company policy for employees to report for work under the influence of drugs or intoxicants. Drug or intoxicants could include legal as well as illegal drugs. Such offenses may result in discipline up to and including discharge.

Illegal drugs are drugs or controlled substances which are:

1. Not legally obtainable (e.g., cocaine).
2. Legally obtainable prescription drugs which are unlawfully obtained or used in a manner not prescribed.

Legal drugs are those prescribed or over-the-counter drugs which are legally obtained by the employee and used for the purpose for which they are prescribed and sold. Such legal drugs can affect the safety of the employee, fellow employees and members of the public. Therefore, any employee who believes or has been informed by their physician or pharmacist that he/she is taking legal drugs which may impair safety, performance or any motor function should advise his or her supervisor of such medication before reporting for work. If the Company determines that such use does not pose any safety risk, the employee will be permitted to work. If such use impairs the employee's ability to safely or effectively perform his or her job, the Company may temporarily reassign the employee or place the employee on a leave of absence during the period of treatment.

Employees involved in workplace accidents which result in significant work place damage or requires medical treatment (defined herein as non-routine first aid) within twenty-four (24) hours will be subject to being tested for substance abuse.

For the purpose of this policy, "non-routine first aid" shall include any injury to the employee requiring, in the opinion of management, the attention of a physician, emergency medical technician, transportation to a medical facility off the plant premises or an injury of a serious nature beyond those normally occurring. It does not include treatment for a chronic condition requiring medical treatment, including but not limited to, repetitive motion injuries, tendinitis, back or disc injuries.

The screen and confirmation cutoff readings listed below will be used to indicate that an employee has tested positive for drugs by urinalysis.

| DRUG | SCREEN CUTOFF | CONFIRMATION |
|------|---------------|--------------|
| Delta-THC-9 Carboxylic Acid (marijuana) | 100 | 15 |
| Benzoylecogonine (cocaine) | 300 | 150 |
| Morphine (Opiates) | 300 | 300 |
| Amphetamines | 1000 | 500 |
| Barbiturates | 200 | 200 |
| Benzodiazepines | 300 | 300 |
| Phencyclidine (PCP) | 25 | 25 |
| Methaqualone | 750 | 750 |

Any testing and sample gathering will be done by qualified professionals in accordance with federal guidelines for such tests including claim of custody procedures.

Employees who are tested will be informed of the results by a representative of management. If the results of the testing are negative, the employee will return to work immediately and will be paid for any time lost.

If the results are positive the employee will be given seven (7) days to enroll in a substance abuse program. Management will assist where possible in locating an appropriate program.

## THE RESPONSIBILITY TO LOCATE AND ENROLL
## IN A PROGRAM IS THE EMPLOYEES NOT MANAGEMENT

The employee will be placed on leave of absence until completion of the substance abuse program. If the employee does not satisfactorily complete the program he/she will be discharged. Employees testing positive will not return to the workplace until test results are negative. Employees returning to work after a positive drug test will be subject to a periodic and unannounced test, no more than two (2) times during a period of twelve (12) months following the return to work. Employees testing positive will be terminated.

Employees are to be given the opportunity prior to testing to list all drugs they have taken recently including prescribed drugs and to explain the circumstances of the use of those drugs in writing. This listing and explanation, if any, shall be kept in confidence unless there is a positive screen. If there is a positive screen, it will be reviewed by those necessary on a strictly need-to-know basis.

Any employee who adulterates a specimen or otherwise attempts to invalidate a test will be subject to discharge.

Employees who believe they may have an alcohol or drug abuse problem may request assistance from Management which will on a confidential basis suggest appropriate programs of treatment.

Employees who voluntarily request the assistance of Management with drug and alcohol abuse problems may do so without jeopardizing continued employment with the Company provided they enroll in and strictly adhere to all the terms of outside treatment and counseling programs.

In order to be considered a voluntary request, an employee must request assistance before an accident which would require a test. An employee may request assistance after a work-related accident and enter a treatment program without being tested, but such employee will be considered to have a positive test result.

Voluntary requests for assistance do not prevent disciplinary actions for prior positive test results or any ongoing or future violations of the Company's rules for conduct, safety and health.

Identities of those employees tested, the reasons for such tests, test results, and employee referral are matters of the greatest confidence. Only those individuals with a strict need-to-know should be informed. Results of an employee's test for the use of drugs shall be transmitted to the Vice President of Industrial Relations. In order to effectively address an employee with drug or alcohol problems, it may be necessary for management to consult with other persons in the process. Such results will be disseminated only on a very strict need-to-know basis.

Testing above and beyond the requirements of this procedure may also be conducted as required to comply with applicable state and federal laws. This policy may be changed to conform to applicable state and federal laws subject to the requirements of the National Labor Relations Act.

Any employee subject to testing for substance abuse will be advised of his/her right to have a Shop Steward present for consultation.

The employee will be required to sign a consent form prior to any substance abuse testing. An employee who fails to consent to such testing will be considered to have a positive test result.

Janef, INC.
AND

_____
employee name

## RETURN TO WORK AGREEMENT

1. I, _____, promise to enter into, fully cooperate and participate in, and satisfactorily complete, an alcohol treatment program, which is accredited or certified by an appropriate professional organization.

2. I authorize health care professionals, counselors or other treating professionals to advise Janef, Inc. officials regarding my attendance, progress, and suitability for continued employment, including disclosure of drug testing results, medical or psychiatric evaluations of me.

3. I understand and agree, that upon my return to active employment, I must meet all standards of conduct and performance required of other employees who are covered by a collective bargaining agreement . [who are not covered by a collective bargaining agreement.]

4. I understand and agree that my future employment with Janef, Inc. depends upon my remaining free of drug and alcohol abuse for the entire duration of my employment.

5. I also understand and agree that this RETURN TO WORK AGREEMENT constitutes the final opportunity which will be afforded to me and that the conditions listed above in no way alter Janef, Inc. rights to alter my employment relationship with at will, including for the reasons set forth above.

_____ has been advised to take time to consider this Agreement and that he /she may consult with an attorney (and /or Union representative) prior to signing this Agreement. After due consideration and having freely and knowingly elected to sign this Agreement, _____ intends to be fully and finally bound by the terms of this Agreement.

_____          _____
(employee name)                                              (name, title, company)

Dated : _____          Dated : _____

AGREEMENT BETWEEN JANEF, INC. T/A ALPERIN CO. AND MAYFLOWER MFG. AND UNITE HERE !

September 2005

A one year contract will be effective September 1, 2005 through August 31, 2006.

A $.20 per hour wage increase will be put into effect, and all employees will become time rate employees at a rate equivalent to their computed Labor Day 2005 Holiday Average increased by the $.20 raise. {No employee will be paid at a rate less than $6.25 per hour and none will be paid at a rate greater than $10.28 per hour}

Future contracts will include a minimum cost of living increase plus an increment based on individual performance reviews. Consideration will be given for flexibility, quality, attendance, cooperation, etc.

Effective September 1, 2005 the designated percentage for insurance benefits is 30.78% and the pension is 3% of union gross wages reduced by any holiday and vacation pay.

This is the contract language revised to represent our current practice:

## ARTICLE X - HOLIDAYS

Section 1. Number of Holidays: Employees shall receive the holidays set forth below with pay irrespective of the day of the week on which the holiday falls:

| | |
|---|---|
| NEW YEARS DAY | MARTIN LUTHER KING JR. DAY (see local rule) |
| GOOD FRIDAY | EASTER MONDAY |
| MEMORIAL DAY | INDEPENDENCE DAY |
| LABOR DAY | THANKSGIVING DAY |
| CHRISTMAS DAY | FRIDAY AFTER THANKSGIVING |
| FLOATING HOLIDAY (PRESIDENT'S DAY, See Local Rule*) | |

Should any of the holidays fall on Sunday, the date celebrated as such shall be considered the holiday.

Paid days equivalent to second week of Summer Vacation based on 2004 "vacation period" revision *:

FRIDAY BEFORE MEMORIAL DAY
FRIDAY BEFORE LABOR DAY
MONDAY AFTER THANKSGIVING
ONE DAY TO ENHANCE WINTER VACATION
ONE ADDITIONAL PERSONAL DAY

[*Eligibility for these days is based on Vacation criteria - see Article XI, Section 2 (II), (III).]

(A). Local Rule: (1.) There will be a Personal/Sick Day in celebration of Martin Luther King Day which is now a work day. Anyone participating in celebration of Martin Luther King Day will be excused from work.

(2.) Presidents' Day shall be a work day, with another day to be substituted as follows:

AGREEMENT BETWEEN JANEF, INC. T/A ALPERIN CO. AND MAYFLOWER MFG. AND UNITE HERE !

    a. When Christmas falls on Sunday, Monday, Tuesday or Wednesday, the paid holiday will be a Personal/Sick Day instead of Presidents' Day.

    b. When Christmas falls on a Thursday, Friday or Saturday, the additional paid holiday in lieu of Presidents' Day will be the working day before Christmas vacation.

    Note: Some years will have 3 Personal Days, some years will have 2 Personal Days.

    (3.) Personal Days are available each calendar year (Jan. 1 - Dec. 31). Anyone who does not claim their Personal/Sick day(s) will be paid for them at the end of the year.

    (4.) New Hires will accrue Personal/Sick days after 3 months employment (1 day) and 6 months employment (1 day) from date of hire.

    (5.) Any unused accrued Personal/Sick days will be paid in the event of separation.

    Section 2. Eligibility:  (a) Plant shutdowns shall not relieve the Employer of the holiday pay obligations herein provided unless the Employer's factory is shut down in all its manufacturing department for five (5) consecutive weeks as follows:

    (1). The entire (2) two weeks immediately preceding the week in which such paid holiday occurs; and

    (2). The entire week during which such paid holiday occurs; and

    (3). The entire two (2) weeks immediately following the week in which such paid holiday occurs.

    (b). An employee absent from work because of personal illness certified by a doctor's certificate shall be entitled to holiday pay unless such employee is ill for three full consecutive weeks as follows:

    (1). The entire week immediately preceeding the week in which such paid holiday occurs; and

    (2). The entire week during which such paid holiday occurs; and

    (3) The entire week immediately following the week in which such paid holiday occurs.

    (c). Any employee who is absent from work without reasonable excuse on the work day before or the work day after a holiday shall not be entitled to holiday pay.

    Tandem or Consecutive Holidays -. The "day before and after" rule shall apply to all holidays with the exception that, should separate holidays fall either simultaneously or successively, an employee absent, (without reasonable cause as heretofore defined), either the day before or the day after, shall lose only one of the holidays. In the event an employee is absent (without reasonable cause as heretofore defined), both the day before and the day after, the employee shall lose holiday pay for all intervening holidays.

    (d) An employee shall not be entitled to holiday pay unless he or she has been employed thirty (30) days.

    Section 3. Holiday Pay for time workers shall be eight (8) times the employees current hourly rate.

AGREEMENT BETWEEN JANEF, INC. T/A ALPERIN CO. AND MAYFLOWER MFG. AND UNITE HERE !

## ARTICLE XI - VACATIONS

Section 1.  Vacation Period:  Summer- It is mutually agreed that there shall be a vacation period for employees entitled to vacation pay as hereinafter provided the week in which July 4th falls in each year unless the Employer and the Union shall mutually agree upon some other week during the summer months. In the event that a paid holiday falls within the vacation period, employees entitled to holiday pay shall be entitled to such holiday pay in addition to vacation pay.

The Employer shall give employees reasonable notice of any change in the schedule of a vacation period.

The Employer with prior agreement with the Union may designate another period for vacation purposes during the summer months for those employees primarily involved in shipping, receiving, plant layout, maintenance or mechanical work, watchmen or firemen work in order to serve the needs or security of the plant.

Winter -  It is mutually agreed that there shall be a vacation period to be held the week in which either Christmas or New Year's Day falls, with pay consisting of 5 days, in addition to holiday pay.

Fourth Week Vacation - Employees with 20 years of seniority as of January 1 in each year, shall be entitled to a fourth (4th) week of paid vacation to be taken during the ensuing twelve (12) months. The schedule of vacation shall be fixed by mutual agreement in accordance with the needs of production, and individual employees may bid for an available week in order of last hire date plant seniority. If mutually agreed to at the local level, an employee may elect to work during his/her week of vacation at straight time in addition to vacation pay. The amount of time off and pay shall be the same as the preceding Winter vacation.

Eligibility for the fourth week vacation will include service with a prior employer who was purchased by an Employer herein provided; the prior Employer's employees were represented by the Union; no significant hiatus existed between the closure of the plant by the prior Employer and the resumption of operations by the Employer herein; this clause will not apply where there was an agreement or understanding at the time of the purchase between the Employer and the Union that the employees would start as new employees, without seniority.

Section 2.  Eligibility : Each employee shall receive vacations with pay in accordance with the following requirements:

(I) On completion of 1 year of service, 1 week vacation at the next ensuing regularly scheduled vacation period (either winter or summer, whichever comes first).

(II) On completion of 2 years of service, 1 week of summer vacation and the 5 equivalent paid days, except that an employee who first becomes eligible for two weeks of vacation prior to the winter vacation shall receive one week of winter vacation and one week of summer vacation.

(III) On completion of 3 years of service, 1 week of summer vacation, the 5 equivalent paid days, and 1 week of winter vacation.

AGREEMENT BETWEEN JANEF, INC. T/A ALPERIN CO. AND MAYFLOWER MFG. AND UNITE HERE !

An employee otherwise eligible for a paid vacation shall not be deemed off the payroll because of the fact that he is temporarily laid off, ill, on authorized leave of absence or in the armed forces at the commencement of the vacation period. The arbitrator hereinafter designated is empowered to determine whether an employee, discharged prior to the commencement of a vacation period, but otherwise eligible for a paid vacation, shall be entitled to a vacation pay.

An employee on authorized leave of absence at the commencement of the vacation period shall not be entitled to vacation pay until and unless he/she returns to employment. The rights of an employee in the armed forces at the commencement of the vacation period shall be as governed by applicable statute.

In the event that the operations of the Employer are terminated prior to the commencement of the vacation period for any reason whatsoever the Employer shall be liable for vacation pay pro-rated to the date of the termination of operations. In such event vacation pay shall be paid immediately upon the termination of operation or as soon thereafter as the vacation payroll can be prepared.

Section 3.  Computation of Vacation Pay: In the case of time workers, the first week of summer vacation or the week of winter vacation shall be forty (40) times the employee's current hourly rate.

With reference to the provisions of the Agreement dealing with vacations and paid holidays, an employee who has been permanently and formally scheduled to work more or less than eight (8) hours a day shall be compensated for vacation and holidays on the basis of the daily schedule of hours which such employee is permanently and formally scheduled to work.

EXTENSION OF THE COLLECTIVE BARGAINING AGREEMENT
BY AND BETWEEN JANEF AND UNITE HERE MID-ATLANTIC
REGIONAL JOINT BOARD AND IT'S LOCAL 137

As of this date August 29, 2006 it is agreed by all parties, (JaneF, Unite Here, Mid-

Atlantic Regional Joint Board and it's Local 137) to extend the current collective

bargaining agreement which is due to expire August 31, 2006.

The extension shall be on a day to day extension until such time that all parties can

collectively agree on mutual dates in which they shall enter into collective bargaining.

It being understood all parties shall put forth every effort to resolve this negotiations in a

timely fashion.

_____                    _____
       Jane F:                                    Unite Here:

_____                    _____
    8/29/06                                       Aug 29, 2006
Date:                                        Date:

**EXHIBIT C**

In the Matter of
ARBITRATION OF DISPUTES

between

THE TRUSTEES OF THE
UNITE HERE NATIONAL HEALTH FUND AND
THE TRUSTEES OF THE
UNITE HERE NATIONAL RETIREMENT FUND,
Petitioners,

and

JANEF INC.
T/A MAYFLOWER*ALPERIN,
Respondent.

**NOTICE OF INTENTION
TO ARBITRATE**

Sir(s):

**PLEASE TAKE NOTICE** that pursuant to the Collective Bargaining Agreement and the Supplemental Agreement thereto (hereinafter, the "Agreement"), between Janef Inc., T/A Mayflower*Alperin (hereinafter, the "Respondent"), and the Mid-Atlantic Regional Joint Board of the Union of Needletrades, Industrial and Textile Employees, presently known as UNITE HERE and upon notice by The Trustees of the UNITE HERE National Health Fund and The Trustees of the UNITE HERE National Retirement Fund (hereinafter, the "Petitioners"), an arbitration will be held before Dr. Philip Ross of 525 West End Avenue, New York, New York 10024 (hereinafter, the "Arbitrator"), designated pursuant to the Agreement, on June 29, 2007, at 11:00 A.M., at the Offices of the Laundry, Dry Cleaning and Allied Workers Joint Board, UNITE HERE!, 275 7th Avenue, 7th Floor, New York, New York 10001, seeking an award against you for:

       1.  Contributions due and owing to Petitioners
           for the periods of 05/22/06 through 07/14/06
           and 12/11/06 through 01/09/07.

together with INTEREST, ARBITRATOR'S FEES and EXPENSES, ATTORNEY'S FEES and the cost of the AUDIT, if awarded.

**PLEASE** ᴛAKE FURTHER NOTICE that unle⸱⸱ you apply to stay this arbitration within twenty (20) days after the service of this notice upon you, you shall be precluded from objecting that a valid agreement was not made or has not been complied with and from asserting in court the bar of a limitation of time.

Dated: June 4, 2007
        New York, New York

THE TRUSTEES OF THE
UNITE HERE NATIONAL HEALTH FUND AND
THE TRUSTEES OF THE
UNITE HERE NATIONAL RETIREMENT FUND

By: _____
        Mark Schwartz, Esq. – MS 0148
        Attorney for Petitioners
        730 Broadway, 10th Floor
        New York, New York 10003-9511
        (212) 539-5275

Account No. 090.0187

Certified Return Receipt No. 7006 2150 0000 7942 6825

Please address all Inquires to:
Michele Reid at (212) 539-5292

**EXHIBIT D**

In the Matter of
ARBITRATION OF DISPUTES

between

THE TRUSTEES OF THE
UNITE HERE NATIONAL HEALTH FUND AND
THE TRUSTEES OF THE
UNITE HERE NATIONAL RETIREMENT FUND,
Petitioners,

and

JANEF INC.
T/A MAYFLOWER*ALPERIN,
Respondent.

**SUBPOENA
DUCES TECUM**

To:    Janef Inc.
       T/A Mayflower*Alperin
       3 Maxson Drive
       Old Forge, Pennsylvania 18518

### GREETING:

**WHEREAS**, an action has been commenced before the Honorable Philip Ross, Impartial Chairman, between The Trustees of the UNITE HERE National Health Fund and The Trustees of the UNITE HERE National Retirement Fund (hereinafter, the "Petitioners"), and Janef Inc., T/A Mayflower*Alperin (hereinafter, the "Respondent"), who are all the parties named in said action,

**NOW, THEREFORE, YOU ARE COMMANDED** to appear and attend before the Honorable Philip Ross, Impartial Chairman, at the Offices of the Laundry, Dry Cleaning and Allied Workers Joint Board, UNITE HERE!, 275 7th Avenue, 7th Floor, New York, New York 10001, on the 29th day of June 2007, at 11:00 A.M. in the morning, and at any recessed or adjourned date for the giving of testimony on all matters relevant to the arbitration hearing,

**AND YOU ARE FURTHER COMMANDED** to produce for examination at such time and place all your payroll records including but not limited to social security quarterly reports, weekly payroll journals, state employment insurance records, cash disbursements book, and any other books or records which are required to determine your liability to the Petitioners for the periods of 05/22/06 through 07/14/06 and 12/11/06 through 01/09/07.

**WITNESS,** Honorable Philip Ross, Impartial Chairman, at New York, New York on the 4th day of June 2007.

THE TRUSTEES OF THE
UNITE HERE NATIONAL HEALTH FUND AND
THE TRUSTEES OF THE
UNITE HERE NATIONAL RETIREMENT FUND

By: _____
Mark Schwartz, Esq. - MS 0148
Attorney for Petitioners
730 Broadway, 10th Floor
New York, New York 10003-9511
(212) 539-5275

Account No. 090.0187

Certified Return Receipt No. 7006 2150 0000 7942 6825

**EXHIBIT E**

# UNITE HERE NATIONAL  HEALTH        FUND

Name of Firm: Janef Inc. a/k/a Mayflower Mfg. Co. a/k/a Alperin Co.

A/C#: 090.0187

Quarter        P.R

/         $_____          05|22|06 - 06|23|06 - $44,227.42

6/06      $ 363,414.58            06|26|06 - 07|14|06 - $15,548.05

9/06      $ 197,439.31            12|11|06 - 12|15|06 - $4,779.63

12/06     $ 158,777.93            12|18|06 - 01|09|07

/         $ 741,631.81
                ÷ 39

$ 19,016.20          Average Weekly Payroll

X              Current Rate: 2893

$ 5,501.38          Average Weekly per Delinquency

$    —            Average Weekly per Capita
                    (Number of Employees x _____)

$ 5,501.38          Total Weekly Delinquency

X              2        Number of Delinquent Weeks:
                        From: _____
                        16,504.14
                $ 58,491.09  >      $ 74,995.23
                    Estimated Total Amount Due

Prior Award:

Interest:        6 X ____ .014          7701 X 2 = 154.02

                                $ 6,750.63 X 2 = 13501.26

Arbitrator's Cost:                      $ 141.00

Total Liability:                        $ 88,731.91

# UNITE HERE NATIONAL BENEFIT FUNDS
## SUMMARY for QUARTER ENDING JUNE 30, 2006

FOR OFFICE USE ONLY

Fill in Entire Account Number
(SEE ENVELOPE FOR ACCT. NO.)

0606    090·  0187

Firm Name (Print) _____ 0900187
JANEF, INC
T/A MAYFLOWER*ALPERIN

Address _____ 1 MAXON DRIVE

City _____ OLD FORGE, PA  18518     6A51007     Zip _____
AL 7035

Telephone: Area C

TO BE ATTACHED ___ Quarterly Earnings Statement, listing gross earnings and total hours supporting the earnings of each employee listed by *complete* name and social security number for quarter beginning _____ 3/26/06

Thru Work Week Ending _____ 6/24/06

This Summary form is designed to facilitate processing of your Quarterly Earnings Statement. The Statement is our principal source for determining employee eligibility for insurance and/or retirement benefits. Failure to report promptly *(within 45 days of end of calendar quarter)* will result in needless and potentially intolerable delay of benefit payments to your employees. Please report in a *complete*, accurate and legible manner.

1. GROSS WAGES (Listed per attached statement)* ............................................ $ 543161.24
2. EXCLUSIONS FROM GROSS WAGES ........................................................... $ 139291.28
   (i.e. Ineligible Executives, Guards, Supervisors, and/or Job Classifications expressly excluded by The Collective Bargaining Agreement.) **IMPORTANT** – All excluded employees must be designated by *clearly indicating their respective job classifications* after their earnings – Attach adding machine tape of excluded earnings.
3. ADJUSTED GROSS WAGES (Line 1 less Line 2) ............................................... $ 403863.96 ✓
4. DEDUCTIONS PERMITTED BY COLLECTIVE BARGAINING AGREEMENT
   a. Holiday Wages  $ 23361.93     opt out F50.00
   b. Vacation Wages  $ 19299.69
   TOTAL DEDUCTIONS (Line 4a plus Line 4b) ................................................ $ 43511.62
5. NET WAGES SUBJECT TO CONTRIBUTIONS (Line 3 less Line 4) .................... $ 360352.34
6. NET WAGES REPORTED AS PER WEEKLY REMITTANCES ............................... $ 360352.34

7. TOTAL HOURS SUPPORTING ADJUSTED GROSS WAGES, as Reported On Line 3    48,937.18 HOURS

**ATTACH TAPE HERE**

**DO NOT WRITE IN THIS SPACE**

| INSURANCE & RETIREMENT | | | | |
|---|---|---|---|---|
| QTR. END. 6/30/06 | | | | |
| NET P/R | % | DATE FRM/TO | CASH | |
| 360352.34 | | | 115060.50 | |
| 221732.40 | 31.93% | 3/31–6/23 | 79831.89 | |
| 138519.94 | 51.93% | | 44229.72 | |
| OVER/SHORT | | | | |

MISC- OPT OUT
C/S short of 683.13 = short credit for April + May
MRCB th short of 44229.72 (138519.94) (2.9932)
Payments incomplete for MRCB 3/26/06 – W/E 6/23/06 situated for correction

Rec'd

KP Batch

To KP

KP Rec'd

Punch     AUG 0 1 2008    FJ

KP Ver

From KP

No. Empl.  110

A.H.W.  8.25

Recon  MS 6/21/07

Recon Entry  MS 6/21/07

**DO NOT WRITE IN THIS SPACE**

NOTE: CONTRIBUTIONS ARE PAYABLE FROM THE FIRST DAY OF EMPLOYMENT AND NO DISTINCTION IS TO BE MADE BETWEEN UNION AND NON-UNION MEMBERS WHETHER PERMANENT, TEMPORARY OR PART-TIME UNLESS EXPRESSLY EXCLUDED BY YOUR COLLECTIVE BARGAINING AGREEMENT.

* FOR PURPOSES OF CONTRIBUTIONS, GROSS WAGES SHOULD NOT INCLUDE ANY DISABILITY BENEFIT PAYMENTS PAID TO EMPLOYEES BY THE FUND.

ALL EMPLOYEE DATA IS RECORDED ACCORDINGLY.  UNLESS THE COMPLETE NAME, SOCIAL SECURITY NUMBER EARNINGS AND HOURS ARE LEGIBLE, THE REPORT WILL BE RETURNED.

DATE 7/18/06    SIGNED Patricia A White    TITLE _____

## UNITE HERE NATIONAL BENEFIT FUNDS
### EXAMINERS' SECTION • 730 BROADWAY • NEW YORK, NY 10003-9511

#2201b-COT-Jun

**UNITE HERE NATIONAL BENEFIT FUNDS**
SUMMARY for QUARTER ENDING SEPTEMBER 30, 2006

FOR OFFICE USE ONLY
Fill in Entire Account Number
(SEE ENVELOPE FOR ACCT. NO.)

090 - 0187

Firm Name (Print)   0900187
JANEF, INC
T/A MAYFLOWER*ALPERIN

Address   1 MAXON DRIVE

City   OLD FORGE, PA 18518

Zip

Telephone: Area C

AN 5512

TO BE ATTACHED — Statutory Earnings Statement, listing gross earnings and total hours supporting the earnings of each employee listed by *complete* name and social security number for quarter beginning   6/25   2006
Thru Work Week Ending   9/23   2006

This Summary form is designed to facilitate processing of your Quarterly Earnings Statement. The Statement is our principal source for determining employee eligibility for insurance and/or retirement benefits. Failure to report promptly *(within 45 days of end of calendar quarter)* will result in needless and potentially intolerable delay of benefit payments to your employees. Please report in a *complete*, accurate and legible manner.

**ATTACH TAPE HERE**

1. GROSS WAGES (Listed per attached statement)*................................................. $ 357,015.76
2. EXCLUSIONS FROM GROSS WAGES............................................................. $ 120,438.47
   (i.e. Ineligible Executives, Guards, Supervisors, and/or Job Classifications expressly excluded by The Collective Bargaining Agreement.) **IMPORTANT** – All excluded employees must be designated by *clearly indicating their respective job classifications* after their earnings – **Attach adding machine tape of excluded earnings.**
3. ADJUSTED GROSS WAGES (Line 1 less Line 2)................................................. $ 236,577.29
4. DEDUCTIONS PERMITTED BY COLLECTIVE BARGAINING AGREEMENT
   a. Holiday Wages  $  14,189.48    opt out is  550.00
   b. Vacation Wages  $  27,397.50
   TOTAL DEDUCTIONS (Line 4a plus Line 4b)................................................ $ 42,137.98
5. NET WAGES SUBJECT TO CONTRIBUTIONS (Line 3 less Line 4)......................... $ 194,439.31
6. NET WAGES REPORTED AS PER WEEKLY REMITTANCES................................ $ 194,439.31

7. TOTAL HOURS SUPPORTING ADJUSTED GROSS WAGES, as Reported 0n Line 3  [ 28,418.56 ] HOURS

**DO NOT WRITE IN THIS SPACE**

MISC = OPT OUT

| INSURANCE & RETIREMENT | | | |
|---|---|---|---|
| QTR. END.  9/30/06 | | | |
| NET P/R | % | DATE FRM/TO | CASH |
| 194,439.31 | | | 62,394.47 |
| 145,745.16 | 31.933 | 6/25-9/22 | 46,536.42 |
| 48,694.16 | 31.933 | opt out credit | (583.31) |
| OVER/SHORT | | | 15,540.25 |
| | | | 16,744.36 |

4th short of 5,763.31 = opt/out credit
PIA Cash short of 15,540.25 (43694.16 - 31933) represents nonpayment for WW 6/3/06 – WW 7/14/06 Firm Scheduled for arbitration

| | |
|---|---|
| Rec'd | |
| KP Batch | NOV 6 2006 |
| To KP | |
| KP Rec'd | |
| Punch | FJ NOV 09 2006 |
| KP Ver | |
| From KP | |
| No. Empl. | 48 |
| A.H.W. | 8.32 |
| Recon | MS 6/21/07 |
| Recon Entry | MS 6/21/07 |

NOTE: CONTRIBUTIONS ARE PAYABLE FROM THE FIRST DAY OF EMPLOYMENT AND NO DISTINCTION IS TO BE MADE BETWEEN UNION AND NON-UNION MEMBERS WHETHER PERMANENT, TEMPORARY OR PART-TIME UNLESS EXPRESSLY EXCLUDED BY YOUR COLLECTIVE BARGAINING AGREEMENT.

*   FOR PURPOSES OF CONTRIBUTIONS, GROSS WAGES SHOULD NOT INCLUDE ANY DISABILITY BENEFIT PAYMENTS PAID TO EMPLOYEES BY THE FUND.

ALL EMPLOYEE DATA IS RECORDED ACCORDINGLY.  UNLESS THE COMPLETE NAME, SOCIAL SECURITY NUMBER EARNINGS AND HOURS ARE LEGIBLE, THE REPORT WILL BE RETURNED.

DATE_____  SIGNED _____  TITLE _____

**UNITE HERE NATIONAL BENEFIT FUNDS**
EXAMINERS' SECTION • 730 BROADWAY • NEW YORK, NY 10003-9511

#2201b-COT-Sep

# UNITE HERE NATIONAL BENEFIT FUNDS
## SUMMARY for QUARTER ENDING _____ DECEMBER 31, 2006

FOR OFFICE USE ONLY · CT
Fill in Entire Account Number
(SEE ENVELOPE FOR ACCT. NO.)
0 900187

Firm Name (Print) **JANET INC TA MAYFLOWER-HIPERIN**

Address **3 MAXSON DRIVE**

City **Old Forge**  State **PA**  Zip **18518**

Telephone: Area Code **570**  Number **4570500**

TO BE ATTACHED TO Quarterly Earnings Statement, listing gross earnings and total hours supporting the earnings of each employee listed by complete name and social security number for quarter beginning **9/24 2006** Thru Work Week Ending **12-16 2006**

This Summary form is designed to facilitate processing of your Quarterly Earnings Statement. The Statement is our principal source for determining employee eligibility for insurance and/or retirement benefits. Failure to report promptly (within 45 days of end of calendar quarter) will result in needless and potentially intolerable delay of benefit payments to your employees. Please report in a complete, accurate and legible manner.

1. GROSS WAGES (Listed per attached statement)* ............... $ **336881.06**
2. EXCLUSIONS FROM GROSS WAGES ............... $ **113,083.45**
   (i.e. Ineligible Executives, Guards, Supervisors, and/or Job Classifications expressly excluded by The Collective Bargaining Agreement.) **IMPORTANT** – All excluded employees must be designated by clearly indicating their respective job classifications after their earnings – Attach adding machine tape of excluded earnings.
3. ADJUSTED GROSS WAGES (Line 1 less Line 2) ............... $ **223797.61**
4. DEDUCTIONS PERMITTED BY COLLECTIVE BARGAINING AGREEMENT
   a. Holiday Wages $ **14282.94** opt out 450.00
   b. Vacation Wages $ **26286.75**
   TOTAL DEDUCTIONS (Line 4a plus Line 4b) ............... $ **41019.69**
5. NET WAGES SUBJECT TO CONTRIBUTIONS (Line 3 less Line 4) ............... $ **182777.92**
6. NET WAGES REPORTED AS PER WEEKLY REMITTANCES ............... $ **182777.92**
7. TOTAL HOURS SUPPORTING ADJUSTED GROSS WAGES, as Reported On Line 3 **26536.07** HOURS

**ATTACH TAPE HERE**

**DO NOT WRITE IN THIS SPACE**

INSURANCE & RETIREMENT

QTR. END. **12/31/06**

NET R & ... DATE FROM/TO ... CASH
182777.92 ... ... 58362.99
167309.16 31.933 9/29-12/16 53581.44
14968.76 31.93% ... 608.85
SHORT ... Total I&R Cont. 53333.?

| Rec'd | |
| KP Batch | |
| KP | |
| KP Rec'd | 906217 |
| Punch | |
| KP Ver | |
| From KP | |
| No. Empl. | 73 |
| A.H.W. | 8.43 |
| Recon | MS 6/21/07 |
| Recon Entry | MS 6/21/07 |

NOTE: CONTRIBUTIONS ARE PAYABLE FROM THE FIRST DAY OF EMPLOYMENT AND NO DISTINCTION IS TO BE MADE BETWEEN UNION AND NON-UNION MEMBERS WHETHER PERMANENT, TEMPORARY OR PART-TIME UNLESS EXPRESSLY EXCLUDED BY YOUR COLLECTIVE BARGAINING AGREEMENT.

* FOR PURPOSES OF CONTRIBUTIONS, GROSS WAGES SHOULD NOT INCLUDE ANY DISABILITY BENEFIT PAYMENTS PAID TO EMPLOYEES BY THE FUND.

ALL EMPLOYEE DATA IS RECORDED ACCORDINGLY. UNLESS THE COMPLETE NAME, SOCIAL SECURITY NUMBER EARNINGS AND HOURS ARE LEGIBLE THE REPORT WILL BE RETURNED.

DATE **1-29-07**  SIGNED **Patricia White**  TITLE

## UNITE HERE NATIONAL BENEFIT FUNDS
EXAMINERS' SECTION · 730 BROADWAY · NEW YORK, NY 10003-9511

#2201b-COT-Sep

| Period | P/B | Rate | Amt Due | | Intrt |
|--------|-----|------|---------|---|-------|
| 5/22 - 6/22/06 | 138,579.84 | 28.93 | $ 400,73.51 | .0102 x 12 = .1224 | $ 4,905.02 |
| 6/26 - 7/14/06 | 48,684.16 | 28.53 | $ 1,408,722 | .0102 x 11 = .1122 | $ 1,580.58 |
| 12/11 - 12/15 | 14,968.76 | 2593 | $ 4,330.46 | .0102 x 6 = .0612 | $ 265.02 |
| | | | $ 5,849.49 | | $ 6,750.62 |

# UNITE HERE NATIONAL RETIREMENT FUND

Name of Firm: _Janet Inc. a/k/a Mayflower Mfg. Co. a/k/a Alperin Co._

A/C#: ___090.0187___

| Quarter | P/R |
|---|---|
| / | $_____ |
| 6 /06 | $_264,414.58_ |
| 9 /06 | $_194,439.21_ |
| 12/06 | $_183,7779.2_ |
| / | $_741,631.81_ |

÷ 39

05/22/06 - 06/23/06 ~ $44,229.42

06/26/06 - 07/14/06 ~ $15,548.05

12/11/06 - 12/15/06 ~ $4,779.53

12/18/06 - 01/09/07

$__13,016.30__ Average Weekly Payroll

X         Current Rate: __43___

$____570.48____ Average Weekly per Delinquency

$_____ Average Weekly per Capita
(Number of Employees x _____)

$___570.48___ Total Weekly Delinquency

X         3     Number of Delinquent Weeks:
From: __12/18 - 1/9/07__

1,711.44
$__6065.47__        7,776.91
Estimated Total Amount Due

Prior Award:

Interest: ( 6% . 0.02355) = .014

7.98 x 2 = 15.96
$_700.02 x 2 = 1,400.04_

Arbitrator's Cost: $__141.00__

Total Liability: $__9,333.91__

# UNITE HERE NATIONAL BENEFIT FUNDS
## SUMMARY for QUARTER ENDING JUNE 30, 2006

FOR OFFICE USE ONLY

Fill in Entire Account Number
(SEE ENVELOPE FOR ACCT. NO.)

090 · 018

Firm Name (Print) 0900187
JANEF, INC
T/A MAYFLOWER*ALPERIN
Address 1 MAXON DRIVE
City OLD FORGE, PA 18518

10606

6A51007
AL 7035

Zip

Telephone: Area C

TO BE ATTACHED: ~~a Quarterly Earnings Statement, listing gross earnings and~~ total hours supporting the earnings of each employee listed by *complete* name and social security number for quarter beginning 3/26/06 Thru Work Week Ending 6 24 06

This Summary form is designed to facilitate processing of your Quarterly Earnings Statement. The Statement is our principal source for determining employee eligibility for insurance and/or retirement benefits. Failure to report promptly *(within 45 days of end of calendar quarter)* will result in needless and potentially intolerable delay of benefit payments to your employees. Please report in a *complete*, accurate and legible manner.

**ATTACH TAPE HERE**

1. GROSS WAGES (Listed per attached statement)*.................................... $ 543,161.24
2. EXCLUSIONS FROM GROSS WAGES.......................................... $ 139,297.28
   (i.e. Ineligible Executives, Guards, Supervisors, and/or Job Classifications expressly excluded by The Collective Bargaining Agreement.) **IMPORTANT** – All excluded employees must be designated by *clearly indicating their respective job classifications* after their earnings – Attach adding machine tape of excluded earnings.
3. ADJUSTED GROSS WAGES (Line 1 less Line 2)................................ $ 403,863.96 ✓
4. DEDUCTIONS PERMITTED BY COLLECTIVE BARGAINING AGREEMENT
   a. Holiday Wages $ 23,361.93     opt out $50.00
   b. Vacation Wages $ 19,299.69
   TOTAL DEDUCTIONS (Line 4a plus Line 4b)................................ $ 43,511.62
5. NET WAGES SUBJECT TO CONTRIBUTIONS (Line 3 less Line 4)............... $ 360,352.34
6. NET WAGES REPORTED AS PER WEEKLY REMITTANCES..................... $ 360,352.34
7. TOTAL HOURS SUPPORTING ADJUSTED GROSS WAGES, as Reported On Line 3    48,937.18 HOURS

| INSURANCE & RETIREMENT | | | | | |
|---|---|---|---|---|---|
| QTR. END. 6/30/06 | | | | Rec'd | |
| | | | | KP Batch | |
| | | | | To KP | |
| NET P/R | % | DATE FRM/TO | CASH | KP Rec'd | |
| 360,352.34 | | | 115,060.53 | Punch | AUG 0 ? 2008  FJ |
| 221,832.40 | 31.93% | 3/31-6/23 | 79,831.09 | KP Ver | |
| | | opt/out credit | (683.18) | From KP | |
| 138,519.94 | 31.93% | opt/out credit | 44,229.80 | No. Empl. | 110 |
| OVER/SHORT | | Total 6/1 Short | 44,912.59 | A.H.W. | 8.25 |
| | | | | Recon | MS 6/21/07 |
| | | | | Recon Entry | MS 6/21/07 |

DO NOT WRITE IN THIS SPACE

MISC- opt/out
C/A short of 683.18-
opt/out credit for
April + May
Month short of
44,229.42 (38,519.94)
(3,932)
Payments non payments
for w/e 3/26/06 -
w/e 6/23/06
scheduled for arb. 6/1/07

**NOTE:** CONTRIBUTIONS ARE PAYABLE FROM THE FIRST DAY OF EMPLOYMENT AND NO DISTINCTION IS TO BE MADE BETWEEN UNION AND NON-UNION MEMBERS WHETHER PERMANENT, TEMPORARY OR PART-TIME UNLESS EXPRESSLY EXCLUDED BY YOUR COLLECTIVE BARGAINING AGREEMENT.

* FOR PURPOSES OF CONTRIBUTIONS, GROSS WAGES SHOULD NOT INCLUDE ANY DISABILITY BENEFIT PAYMENTS PAID TO EMPLOYEES BY THE FUND.

ALL EMPLOYEE DATA IS RECORDED ACCORDINGLY. UNLESS THE COMPLETE NAME, SOCIAL SECURITY NUMBER EARNINGS AND HOURS ARE LEGIBLE, THE REPORT WILL BE RETURNED.

DATE 7/18/06     SIGNED Patricia A White     TITLE

## UNITE HERE NATIONAL BENEFIT FUNDS
EXAMINERS' SECTION • 730 BROADWAY • NEW YORK, NY 10003-9511

#2201b-COT-Jun

# UNITE HERE NATIONAL BENEFIT FUNDS
## SUMMARY for QUARTER ENDING SEPTEMBER 30, 2006

FOR OFFICE USE ONLY

Fill in Entire Account Number
(SEE ENVELOPE FOR ACCT. NO.)

090 - 0187

Firm Name (Print) 0900187
JANEF, INC

Address  T/A MAYFLOWER*ALPERIN
1 MAXON DRIVE

City  OLD FORGE, PA 18518          Zip

AN 5512

Telephone: Area C

TO BE ATTACHED ... weekly Earnings Statement, listing gross earnings and total hours supporting the earnings of each employee listed by *complete* name and social security number for quarter beginning 6/25 2006
Thru Work Week Ending 9/23 2006

This Summary form is designed to facilitate processing of your Quarterly Earnings Statement. The Statement is our principal source for determining employee eligibility for insurance and/or retirement benefits. Failure to report promptly *(within 45 days of end of calendar quarter)* will result in needless and potentially intolerable delay of benefit payments to your employees. Please report in a *complete*, accurate and legible manner.

**ATTACH TAPE HERE**

1. GROSS WAGES (Listed per attached statement)*............................................ $ 357,015.76
2. EXCLUSIONS FROM GROSS WAGES................................................................ $ 120,438.47

    (i.e. Ineligible Executives, Guards, Supervisors, and/or Job Classifications expressly excluded by The Collective Bargaining Agreement.) **IMPORTANT** – All excluded employees must be designated by *clearly indicating their respective job classifications* after their earnings – **Attach adding machine tape of excluded earnings.**

3. ADJUSTED GROSS WAGES (Line 1 less Line 2).................................................. $ 236,577.29 ✓
4. DEDUCTIONS PERMITTED BY COLLECTIVE BARGAINING AGREEMENT
    a. Holiday Wages  $ 14,189.48   opt out b 550.00
    b. Vacation Wages  $ 27,398.50

    TOTAL DEDUCTIONS (Line 4a plus Line 4b)..................................................... $ 42,137.98
5. NET WAGES SUBJECT TO CONTRIBUTIONS (Line 3 less Line 4)....................... $ 194,439.31
6. NET WAGES REPORTED AS PER WEEKLY REMITTANCES........................... $ 194,439.31 ✓

7. TOTAL HOURS SUPPORTING ADJUSTED GROSS WAGES, as Reported 0n Line 3   2841856 HOURS

MISC = OPT/OUT

**DO NOT WRITE IN THIS SPACE**

**INSURANCE & RETIREMENT**

QTR. END. 9/30/06

| NET P/R | % | DATE FRM/TO | CASH |
|---|---|---|---|
| 194,439.31 | | | 63,024.47 |
| 145,745.15 | 31.933 | 6/30-9/22 | 46,536.42 |
| | | OPT/OUT credit | (596.31) |
| 48,694.16 | 31.933 | opt out credit | 15,548.05 |
| OVER/SHORT | | Total Cash Short | 16,144.36 |

| | |
|---|---|
| Rec'd | |
| KP Batch | NOV 6 2006 |
| To KP | |
| KP Rec'd | |
| Punch | FJ NOV 09 2006 |
| KP Ver | |
| From KP | |
| No. Empl. | 48 |
| A.H.W. | 8.32 |
| Recon | MS 6/21/07 |
| Recon Entry | MS 6/21/07 |

cash short of 596.31 = opt/out credit

P/R Cash Short of 15,548.05 (43,694.16) (31.933%) represents nonpayment for W/E 6/30/06 — W/E 7/14/06 Firm scheduled for arbitration

**NOTE:** CONTRIBUTIONS ARE PAYABLE FROM THE FIRST DAY OF EMPLOYMENT AND NO DISTINCTION IS TO BE MADE BETWEEN UNION AND NON-UNION MEMBERS WHETHER PERMANENT, TEMPORARY OR PART-TIME UNLESS EXPRESSLY EXCLUDED BY YOUR COLLECTIVE BARGAINING AGREEMENT.

* FOR PURPOSES OF CONTRIBUTIONS, GROSS WAGES SHOULD NOT INCLUDE ANY DISABILITY BENEFIT PAYMENTS PAID TO EMPLOYEES BY THE FUND.

ALL EMPLOYEE DATA IS RECORDED ACCORDINGLY. UNLESS THE COMPLETE NAME, SOCIAL SECURITY NUMBER EARNINGS AND HOURS ARE LEGIBLE, THE REPORT WILL BE RETURNED.

DATE              SIGNED              TITLE

## UNITE HERE NATIONAL BENEFIT FUNDS
### EXAMINERS' SECTION • 730 BROADWAY • NEW YORK, NY 10003-9511

#2201b-COT-Sep

# UNITE HERE NATIONAL BENEFIT FUNDS
## SUMMARY for QUARTER ENDING DECEMBER 31, 2006

FOR OFFICE USE ONLY    CT

Fill in Entire Account Number
(SEE ENVELOPE FOR ACCT. NO.)

0 900187

Firm Name (Print)  JANET Inc. TA Mayflower-141 PECIn

Address  3 MAXSON DRIVE

City  Old FORGE    State  PA    Zip  18518

Telephone: Area Code  570  Number  457 0500

TO BE ATTACHED TO Quarterly Earnings Statement, listing gross earnings and total hours supporting the earnings of each employee listed by *complete name* and social security number for quarter beginning  9 24  2006  Thru Work Week Ending  12-16  2006

This Summary form is designed to facilitate processing of your Quarterly Earnings Statement. The Statement is our principal source for determining employee eligibility for insurance and/or retirement benefits. Failure to report promptly *(within 45 days of end of calendar quarter)* will result in needless and potentially intolerable delay of benefit payments to your employees. Please report in a *complete*, accurate and legible manner.

1. GROSS WAGES (Listed per attached statement)*.................................. $ 336,881.06
2. EXCLUSIONS FROM GROSS WAGES.................................. $ 113,083.45

(i.e. Ineligible Executives, Guards, Supervisors, and/or Job Classifications expressly excluded by The Collective Bargaining Agreement.) **IMPORTANT** – All excluded employees must be designated by *clearly indicating their respective job classifications* after their earnings – Attach adding machine tape of excluded earnings.

3. ADJUSTED GROSS WAGES (Line 1 less Line 2).................................. $ 223,797.61 ✓
4. DEDUCTIONS PERMITTED BY COLLECTIVE BARGAINING AGREEMENT
   a. Holiday Wages  $ 14,282.94    opt out 450.00
   b. Vacation Wages  $ 26,286.75
   TOTAL DEDUCTIONS (Line 4a plus Line 4b).................................. $ 41,019.69
5. NET WAGES SUBJECT TO CONTRIBUTIONS (Line 3 less Line 4).................. $ 182,777.92
6. NET WAGES REPORTED AS PER WEEKLY REMITTANCES.................. $ 182,777.92

7. TOTAL HOURS SUPPORTING ADJUSTED GROSS WAGES, as Reported On Line 3  26,536.07 HOURS

**ATTACH TAPE HERE** (left margin, vertical)

**DO NOT WRITE IN THIS SPACE** (left and right margins, vertical)

### INSURANCE & RETIREMENT

QTR. END.  12/31/06

MISC = OPT OUT
Cash short of 608.85 = opt out credit
FICA Cash Short of 4,779.53 (14,968.76 @ 31.93%) Represents non payment for W/E 12/16/06 firm scheduled for arbitration

| NET P.R. | % | DATE FROM/TO | CASH | | |
|---|---|---|---|---|---|
| 182,777.92 | | | 58,360.99 | Rec'd | |
| 167,809.16 | 31.93% | 9/29-12/16 | 53,581.44 | KP Batch | |
| 14,968.76 | 31.93% | offset credit opt out credit | 608.85 (608.85) 4,779.53 | To KP | |
| C/V SHORT | | | | KP Rec'd | 906217 |
| | | | | Punch | |
| | | Total Cash Short: 5,388.40 | | KP Ver | |
| | | | | From KP | |
| | | | | No. Empl. | 73 |
| | | | | A.H.W. | 8.43 |
| | | | | Recon | MS 6/21/07 |
| | | | | Recon Entry | MS 6/21/07 |

NOTE: CONTRIBUTIONS ARE PAYABLE FROM THE FIRST DAY OF EMPLOYMENT AND NO DISTINCTION IS TO BE MADE BETWEEN UNION AND NON-UNION MEMBERS WHETHER PERMANENT, TEMPORARY OR PART-TIME UNLESS EXPRESSLY EXCLUDED BY YOUR COLLECTIVE BARGAINING AGREEMENT.

* FOR PURPOSES OF CONTRIBUTIONS, GROSS WAGES SHOULD NOT INCLUDE ANY DISABILITY BENEFIT PAYMENTS PAID TO EMPLOYEES BY THE FUND.

ALL EMPLOYEE DATA IS RECORDED ACCORDINGLY. UNLESS THE COMPLETE NAME, SOCIAL SECURITY NUMBER, EARNINGS AND HOURS ARE LEGIBLE THE REPORT WILL BE RETURNED.

DATE  1-29-07  SIGNED  Patricia White  TITLE

## UNITE HERE NATIONAL BENEFIT FUNDS
**EXAMINERS' SECTION • 730 BROADWAY • NEW YORK, NY 10003-9511**

515

#2201b-COT-Sep

FEB 01 2007

| Period | | Bal. | Rate | Int. $ |
|---|---|---|---|---|
| 3/23/06 | – 6/26/06 | 138,519.94 | 3% | $ 4,155.59 |
| 6/26/06 | – 7/4/06 | 48,604.15 | 3% | $ 1,460.32 |
| 12/1/06 | – 12/15/06 | 14,968.76 | 3% | $ 449.06 |
| | | | | $ 6,065.47 |

Interest

| $ 4,155.59 | (.012 × 12) | .1224 | $ 508.64 |
|---|---|---|---|
| $ 1,460.32 | (.0102 × 11) | .1122 | $ 163.90 |
| 449.06 | (.0102 × 6) | .0612 | $ 27.48 |
| | | | $ 700.02 |